## STATE OF CONNECTICUT *v.* J'VEIL OUTING
## (SC 17707)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.*

---

*This case originally was argued before a panel of this court consisting of Justices Norcott, Katz, Palmer, Vertefeuille and McLachlan. Thereafter, the court, pursuant to Practice Book § 70-7 (b), sua sponte, ordered that the case be considered en banc. Accordingly, Chief Justice Rogers and Justice Zarella were added to the panel, and they have read the record, briefs and transcripts of oral argument.

The listing of justices reflects their seniority status on this court as of the date of oral argument.

Argued March 25, 2009—officially released August 31, 2010

*James B. Streeto,* assistant public defender, for the appellant (defendant).

*Nancy L. Chupak,* senior assistant state's attorney, with whom were *Beth Baran,* senior assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, for the appellee (state).

*Lisa J. Steele, David M. Siegel* and *Yvonne Chan* filed a brief for the New England Innocence Project as amicus curiae.

*Opinion*

KATZ, J. The defendant, J'Veil Outing, directly appeals[1] from the trial court's judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes § 53a-54a (a).[2] The defendant claims that the trial court improperly: (1) denied his motion to suppress the testimony of two eyewitnesses who had identified the defendant as the shooter; (2) barred him from presenting certain expert testimony at the hearing on his motion to suppress on the reliability of eyewitness identifications; (3) prohibited the defendant's expert from providing that same testimony at trial; (4) refused to order the disclosure of certain mental health records of a state's witness; and (5) denied the defendant's motion for a mistrial due to the state's purported violation of the trial court's sequestration order. In addi-

---

[1] The defendant appealed directly to this court from the trial court's judgment pursuant to General Statutes § 51-199 (b), which provides in relevant part: "The following matters shall be taken directly to the Supreme Court . . . (3) an appeal in any criminal action involving a . . . felony . . . for which the maximum sentence which may be imposed exceeds twenty years . . . ."

[2] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

tion, the defendant claims that the assistant state's attorney engaged in prosecutorial impropriety during her examination of certain witnesses and during closing argument, thereby depriving the defendant of his constitutional due process right to a fair trial. We reject the defendant's claims and, accordingly, we affirm the trial court's judgment.

The jury reasonably could have found the following facts. At approximately 6:50 p.m. on June 23, 2005, Nadine Crimley was walking in a northerly direction on Canal Street in New Haven, pushing her infant son in a stroller. To her left, she saw her brother, Ray Caple, standing on the porch of her residence at 150 Canal Street. As Crimley walked up the street, she saw the defendant, whom she previously had seen in the neighborhood, pass her on his bicycle. Another unidentified man rode a bicycle in front of the defendant. Crimley then turned her attention back to her son. When she heard a series of popping noises, she looked up and saw the defendant, who was about ten feet away from her, firing a gun at the victim, Kevin Wright. The victim fell to the ground, and the defendant ran from the scene.

Caple, who had gone to high school with the defendant and had known him for three and one-half years, also watched the defendant as he rode his bicycle up Canal Street. As Caple watched, the defendant moved his right hand toward his waist. Caple believed that the defendant was reaching for a gun and was going to shoot him, but decided against doing so because Caple was holding his two year old daughter. Caple's mother and the victim were inside the residence at 150 Canal Street. Just after the defendant passed the residence on his bicycle, the victim exited through the back door of the residence, retrieved his bicycle from the backyard and walked with it in an easterly direction on Gregory Street toward its intersection with Canal Street. As Caple stood on the porch, he heard a gunshot and the

sound of a bicycle falling to the ground. When he looked around the corner of the porch, he observed Crimley and her son standing very close to the defendant, and he also saw the defendant, who had dismounted from his bicycle, fire three more shots at the victim. The defendant then ran away, leaving his bicycle in the street. Caple ran to the victim, who was unresponsive. The victim died from a single gunshot wound to the chest.

Shortly, after 10 p.m. on the day of the shooting, Crimley gave a statement to the New Haven police in which she indicated that she had been able to get a good look at the shooter and would be able to identify him. On June 27, 2005, four days after the shooting, Stephen Coppola, a New Haven police detective, interviewed Crimley and presented her with an array of eight photographs, including one of the defendant. Crimley identified the defendant as the shooter and signed and dated the photographic array. Coppola tape-recorded his interview of Crimley. On the same day, Coppola also tape-recorded a statement from Caple and presented him with a second photographic array. Caple also identified the defendant as the shooter and signed and dated the photographic array.

Prior to trial, both Caple and Crimley recanted their statements to the police and their identifications of the defendant, claiming that they had been pressured by the police into giving the statements and making the identifications. Thereafter, the defendant filed motions to suppress the identification evidence, claiming that the evidence was unreliable and the product of an unnecessarily suggestive police identification procedure. At a hearing on the defendant's motions, both Crimley and Caple testified that they did not know who had killed the victim, that they had been pressured by the police to give false statements about the events surrounding the shooting, and that the police had pres-

sured them to falsely identify the defendant as the shooter. Crimley and Caple acknowledged that they were extremely frightened about being called as witnesses for the state and identifying the defendant as the shooter. Coppola and Alfonso Vasquez, a New Haven police detective who had been present during Coppola's interviews of Crimley and Caple, testified that each of the witnesses had identified the defendant as the shooter by selecting the defendant's photograph from the photographic array spontaneously and without hesitation. The two detectives unequivocally denied that they had pressured or influenced either Crimley or Caple in any way.

At the conclusion of the detectives' testimony, the state maintained that the tape-recorded statements that Crimley and Caple had given to the police met the requirements for admissibility set forth in *State* v. *Whelan*, 200 Conn. 743, 753, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986).[3] The trial court found that the testimony of Crimley and Caple that they had been pressured to give false statements and to falsely identify the defendant as the shooter was not credible. The court further concluded that the statements that they had given to the police met the *Whelan* admissibility requirements for purposes of the suppression hearing.

Thereafter, at a continuation of the suppression hearing, the defendant made an offer of proof regarding the testimony of his expert witness, Jennifer Dysart,

[3] "In *State* v. *Whelan*, supra, 200 Conn. [753], this court determined that an out-of-court statement is admissible as substantive evidence if (1) the statement is a prior inconsistent statement, (2) it is signed by the declarant, (3) the declarant has personal knowledge of the facts stated therein, and (4) the declarant testifies at trial and is subject to cross-examination." *State* v. *Holness*, 289 Conn. 535, 547–48, 958 A.2d 754 (2008). Under *State* v. *Woodson*, 227 Conn. 1, 21, 629 A.2d 386 (1993), the signature of a witness is unnecessary for the admission of a tape-recorded statement offered under *Whelan*.

concerning the reliability of eyewitness identifications. The state objected to the testimony, and the court sustained in part and overruled in part the state's objection to Dysart's proffered testimony. Dysart thereafter offered her opinion that the identification procedures used generally were not reliable. The trial court thereafter denied the defendant's motions to suppress the photographic identifications that had been made of the defendant by Crimley and Caple.

At trial, Crimley and Caple testified that the police had pressured them to give false statements and to falsely identify the defendant as the shooter. They further testified that the defendant definitely was not the shooter and that they did not know who had shot the victim. Upon the state's motion pursuant to *Whelan*, the trial court admitted redacted tape recordings of the statements Crimley and Caple had given to the police as prior inconsistent statements.[4] The trial court also admitted as exhibits copies of the photographic arrays that Crimley and Caple had signed and dated. The defendant did not call Dysart as a witness at trial.

Thereafter, the jury found the defendant guilty of murder, and the trial court rendered judgment in accordance with the verdict, sentencing the defendant to a term of imprisonment of fifty years. This direct appeal followed.[5] Additional facts and procedural history will be set forth as necessary.

I

We first turn to the defendant's claims regarding the eyewitness testimony. The defendant contends that the

[4] The trial court's decision to admit those statements under *Whelan* is not at issue in this appeal, either for purposes of their admission at the suppression hearing or at trial.

[5] After the defendant had filed this appeal, we granted permission to the New England Innocence Project to file an amicus brief in support of the defendant's claim that the trial court should have admitted all of Dysart's proposed testimony. We also allowed the state to file a supplemental brief in response.

trial court improperly denied his motion to suppress the identifications by Crimley and Caple because, contrary to the court's conclusions, the evidence established that the identification procedure was unnecessarily suggestive and unreliable. He further contends that the trial court improperly precluded him from presenting certain of Dysart's proffered testimony at the suppression hearing regarding the unreliability of eyewitness identification. Finally, he contends that the trial court improperly precluded him from introducing Dysart's testimony on that subject at trial. We reject the first claim on the merits, we find it unnecessary to reach the second claim, and we conclude that the third claim was not preserved for appellate review.

The following additional facts are necessary to our resolution of these claims. The defendant notified the court and the state that he intended to present the testimony of Dysart, an associate professor of psychology at the John Jay College of Criminal Justice and an expert on the issue of eyewitness identifications. By way of a proffer, Dysart testified that, in her opinion, there is an undue risk of misidentification resulting from the identification procedure if, as occurred in the present case: (1) the photographs are shown to the witness simultaneously rather than sequentially; (2) after advising the eyewitness that the perpetrator may or may not be in the photographic array, the police provide the witness with a form that does not contain a line on which the witness may indicate that the array does not include the perpetrator; and (3) the police do not use a "double-blind" identification procedure, that is, one in which the person administering the procedure does not know the identity of the suspect. Dysart also explained that she intended to testify that: (1) the perpetrator's use of a disguise can impair the ability of a witness to make an accurate identification (disguise

effect);[6] (2) under the principle of "unconscious transference," a witness is more likely to identify a person as the perpetrator if that person looks familiar to the witness; (3) a witness tends to focus on the perpetrator's weapon instead of on the perpetrator, thereby reducing the likelihood of an accurate identification (weapons focus effect); (4) there is little or no correlation between the reliability of an identification and the witness' confidence in the identification; (5) a witness who is under stress while observing the commission of the crime is less likely to make an accurate identification of the perpetrator; and (6) witness collaboration can adversely affect the reliability of an identification. The state objected to Dysart's proffered testimony, claiming, inter alia, that it was inadmissible in light of this court's determination in *State* v. *Kemp*, 199 Conn. 473, 476–77, 507 A.2d 1387 (1986), and *State* v. *McClendon*, 248 Conn. 572, 586–87, 730 A.2d 1107 (1999), that such testimony generally is within the common knowledge and experience of the average person and, therefore, it would not aid the fact finder in evaluating the identification evidence.

The trial court agreed with the state as to certain testimony,[7] but concluded that, "out of an abundance of caution," Dysart could testify on the issues of the simultaneous presentation of photographs, police instructions to the witness, double-blind administration of the identification procedure and the theory of uncon-

---

[6] Crimley testified that the shooter had been wearing a hat. In her proffer, Dysart opined that a hat could trigger the disguise effect.

[7] In reliance on *Kemp* and *McClendon*, the trial court precluded Dysart from testifying that the reliability of the identification can be adversely affected by witness stress, witness collaboration, the perpetrator's use of a disguise and the perpetrator's use of a weapon, and that the witness' confidence in the accuracy of the identification bears little or no relation to the accuracy of the identification. In support of its ruling, the court explained that such testimony was unnecessary because it was "within the realm of . . . common sense and . . . experience."

scious transference. The trial court emphasized that it was limiting its ruling to the testimony at the hearing on the motion to suppress, "where the court is both the finder of fact and the . . . ruler on the legal issues," and left the issue open should the defendant seek to introduce Dysart's testimony at trial.

Thereafter, Dysart testified at the suppression hearing that using a simultaneous photographic array instead of displaying the photographs to the witnesses sequentially created the risk that they would compare the photographs and choose the photograph of the individual who looked most like the perpetrator. She testified that research has shown that, when the photographs are displayed one at a time and the witness does not know how many photographs will be displayed, there is a dramatic decrease in the occurrence of false identifications.

Dysart also testified that studies have demonstrated that, when a witness has been told that the perpetrator may or may not be in the photographic array, the number of false identifications decreases. She testified that, in the present case, both Crimley and Caple had received written forms advising them that it was no less important to clear innocent people as to identify the guilty, that the persons in the photographic array "may not look exactly as they did on the date of the incident, because features like facial or head hair can change," that "[t]he person you saw *may* or *may not* be in these photographs," and that "[t]he police will continue to investigate this incident, whether you identify someone or not." (Emphasis in original.) The forms also contained a line stating: "I understand the instructions, have viewed the [photographs], and have identified [number] __." In Dysart's opinion, the latter statement nullified the preceding instructions because it did not allow the witnesses the option of stating that the perpetrator's photograph was not in the array.

According to Dysart, research also has shown that there is a reduced risk of misidentification when the person administering the photographic array procedure does not know the identity of the suspect, that is, when the procedure is "double-blind." When the person administering the procedure knows the suspect's identity, there is a risk that, intentionally or unintentionally, that person will influence or provide feedback to the identifying witness.

Finally, Dysart explained that, under the theory of unconscious transference, a witness is more likely to misidentify a person as the perpetrator if that person looks familiar to the witness. She further testified that unconscious transference is more likely when the witness is presented with a simultaneous photographic array than with a sequential array. On cross-examination, Dysart acknowledged that the theories about which she had testified were cast in general terms and that she could not say whether they invalidated the identifications at issue in this particular case.

Following Dysart's testimony, Coppola testified at the suppression hearing that, on the day after the murder, he received an anonymous tip that the defendant had shot and killed the victim. Thereafter, he created a photographic array containing a photograph of the defendant and seven of his schoolmates. All eight photographs were taken from the defendant's high school yearbook, and all eight persons in the array, including the defendant, were wearing white shirts, black ties and suit jackets. Vasquez testified that, after showing the photographic array to Caple and before showing it to Crimley, he had moved the defendant's photograph from the number seven position in the bottom row of the array to the number four position in the top row.

After considering that portion of Dysart's testimony that it previously had found to be admissible for pur-

poses of the motion to suppress, the trial court concluded that the identification procedures were not unnecessarily suggestive because there was "a total lack of credible evidence to make the theories of simultaneous showing, relative judgment process, instructional bias, [double-blind] administration, and unconscious transference anything more than theoretical or unrealized biases in this case." In support of this conclusion, the trial court found that: the individual photographs in the photographic array were "remarkably identical" to each other and, therefore, it was improbable that both witnesses had chosen the defendant by comparing his photograph to the others; unconscious transference was unlikely because Caple had known the defendant for three and one-half years and had attended high school with the other persons in the photographic array; both witnesses had had a "good hard look" at the defendant at the time of the shooting; both witnesses had been observers rather than victims and, therefore, were not under undue stress; and both witnesses had identified the defendant as the shooter confidently, promptly and without hesitation after having been told that the shooter's photograph might not be in the array. In addition, Crimley and Caple had given their statements within four days of the shooting, when their memories still were fresh. The trial court further found that the witnesses' testimony that they had been coached to pick the defendant's photograph was not credible and that the tape recordings of their statements did not reveal the existence of any pressure or threats by the police. The court further concluded that, even if the identification procedures had been unnecessarily suggestive, the identifications nonetheless were reliable under the totality of these circumstances.

A

We first address the defendant's challenge to the trial court's denial of his motion to suppress the eyewitness

identifications on the basis of the evidence admitted at the suppression hearing. Specifically, the defendant claims that the identification procedure was unnecessarily suggestive because the police used a simultaneous photographic array, the identification procedure was not double-blind, the use of the photographs from the defendant's high school yearbook increased the risk of unconscious transference and the instruction form accompanying the photographic array inadequately instructed the witnesses that they were not obligated to choose one of the photographs. He further contends that the identification evidence was not reliable because the witnesses' observation of the defendant was brief, their descriptions were general and conflicted with each other, and the witnesses made the identifications after their memories had faded. Accordingly, the defendant contends that the trial court improperly denied his motion to suppress the identification evidence. We conclude that the court properly denied the motion to suppress.

We begin with the legal principles that guide our review. "Due process requires that [eyewitness] identifications [may be admitted at trial] only if they are reliable and are not the product of unnecessarily suggestive police procedures." *State* v. *Kemp*, supra, 199 Conn. 478. Because "reliability is the linchpin in determining the admissibility of identification testimony"; *Manson* v. *Brathwaite*, 432 U.S. 98, 114, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); a two part test has developed to make that determination. In our most recent case to address this issue, *State* v. *Marquez*, 291 Conn. 122, 141–42, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009), we noted the "consensus with regard to the [following] overall analytical framework to be used in considering a claim of this sort: 'In determining whether identification procedures violate a defendant's due process rights, the required inquiry

is made on an ad hoc basis and is two-pronged: first, it must be determined whether the identification procedure was unnecessarily suggestive; and second, *if it is found to have been so*, it must be determined whether the identification was nevertheless reliable based on examination of the totality of the circumstances.' . . . *State* v. *Theriault*, [182 Conn. 366, 371–72, 438 A.2d 432 (1980)]; see also *Manson* v. *Brathwaite*, supra, [107] ('[T]he first inquiry [is] whether the police used an impermissibly suggestive [identification] procedure . . . . *If so*, the second inquiry is whether, under all the circumstances, that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification.'); *United States* v. *DeCologero*, 530 F.3d 36, 62 (1st Cir.) ('we first determine whether the identification procedure was impermissibly suggestive, *and if it was*, we then look to the totality of the circumstances to decide whether the identification was reliable'), cert. denied, 555 U.S. 1005, 129 S. Ct. 513, 172 L. Ed. 2d 376, cert. denied, 555 U.S. 1039, 129 S. Ct. 615, 172 L. Ed. 2d 469 (2008)." (Emphasis added.) This court concluded that "[w]e continue to endorse and adhere to this widely utilized analytical approach." *State* v. *Marquez*, supra, 142.

Therefore, "[t]he critical question . . . is what makes a particular identification procedure 'suggestive' enough to require the court to proceed to the second prong and to consider the overall reliability of the identification." Id. In deciding that question, we stated in *Marquez* that "the *entire* procedure, viewed in light of the factual circumstances of the individual case . . . must be examined to determine if a particular identification is tainted by unnecessary suggestiveness. The individual components of a procedure cannot be examined piecemeal but must be placed in their broader context to ascertain whether the procedure is so suggestive that it requires the court to consider the reliability of the identification itself in order to determine whether it

ultimately should be suppressed." (Emphasis in original.) Id., 146. In making this determination, the court should focus on two factors. "The first factor concerns the composition of the photographic array itself. In this regard, courts have analyzed whether the photographs used were selected or displayed in such a manner as to emphasize or highlight the individual whom the police believe is the suspect." Id., 142–43. "The second factor, which is related to the first but conceptually broader, requires the court to examine the actions of law enforcement personnel to determine whether the witness' attention was directed to a suspect because of police conduct. . . . In considering this [factor, the court should] look to the *effects* of the circumstances of the pretrial identification, not whether law enforcement officers intended to prejudice the defendant. . . . It stands to reason that police officers administering a photographic identification procedure have the potential to taint the process by drawing the witness' attention to a particular suspect. This could occur either through the construction of the array itself or through physical or verbal cues provided by an officer." (Citation omitted; emphasis added; internal quotation marks omitted.) Id., 143–44. The failure of a police officer to provide "an affirmative warning to witnesses that the perpetrator *may or may not* be among the choices in the identification procedure" is one circumstance that may increase the likelihood of a mistaken identification. *State* v. *Ledbetter*, 275 Conn. 534, 574, 881 A.2d 290 (2005), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006).

A simultaneous photographic array is not unnecessarily suggestive per se, however, even if it was not administered in a double-blind procedure. See *State* v. *Marquez*, supra, 291 Conn. 143 ("to be unnecessarily suggestive, variations in array photographs must highlight [the] defendant to [the] point that it affects [the]

witness' selection"); id., 144 ("[a] procedure is unfair which suggests in advance of identification by the witness the identity of the person suspected by the police" [internal quotation marks omitted]); see also *State* v. *Ledbetter*, supra, 275 Conn. 574 ("the trial courts should continue to determine whether individual identification procedures are unnecessarily suggestive on the basis of the totality of the circumstances surrounding the procedure, rather than replacing that inquiry with a per se rule").

Finally, we note that a challenge to a trial court's conclusion regarding whether the pretrial identification procedure was unnecessarily suggestive presents a mixed question of law and fact. *State* v. *Marquez*, supra, 291 Conn. 137. "[B]ecause [however] the issue of the reliability of an identification involves the constitutional rights of an accused . . . we are obliged to examine the record scrupulously to determine whether the facts found are adequately supported by the evidence and whether the court's ultimate inference of reliability was reasonable." (Internal quotation marks omitted.) *State* v. *Reid*, 254 Conn. 540, 554, 757 A.2d 482 (2000). "[W]e will not disturb the findings of the trial court as to subordinate facts unless the record reveals clear and manifest error." (Internal quotation marks omitted.) *State* v. *St. John*, 282 Conn. 260, 277, 919 A.2d 452 (2007).

We therefore first consider whether the trial court in the present case properly found that the identification procedure was not unnecessarily suggestive. We conclude that the trial court's finding that the simultaneous photographic array did not emphasize or highlight the defendant as the person the police believed to be the suspect was not clearly erroneous. Our review of the array satisfies us that the trial court accurately described the eight photographs as "remarkably identical . . . ." All of the individuals in the photographs appear to be approximately the same age, appear to be

the same race, have similar hairstyles and are wearing similar clothing—white shirts, black bow ties and black jackets. In addition, all of the photographs are the same size and format. Although the defendant points out that his photograph is one of only two in which the individual has a small mustache, we note that this feature was not mentioned by the witnesses in their preidentification statements to the police. Indeed, the record does not reveal whether the defendant had a mustache at the time of the murder. We conclude, therefore, that the trial court reasonably could have concluded that this feature in the photograph did not highlight the defendant. See *State* v. *Marquez*, supra, 291 Conn. 132 (procedure is unnecessarily suggestive when "variations in array photographs . . . highlight [the] defendant to [the] point that it affects [the] witness' selection").

We also are not persuaded by the defendant's argument that the use of similar photographs, all taken from the defendant's high school yearbook, necessarily increased the risk of unconscious transference. Under the theory of unconscious transference, a witness is more likely to misidentify an individual as the perpetrator if the witness has seen the individual before or if the individual looks familiar. In the present case, Caple presumably had seen *all* of the individuals in the photographic array before because he attended high school with them. Thus, it is reasonable to conclude that the inclusion of other persons in the photographic array who were familiar to the witness *reduced*, not increased, the risk of unconscious transference.

With respect to Crimley, there was conflicting evidence as to whether she knew the defendant before the murder. There was evidence, however, that she had some familiarity with some of the other individuals in the photographs. Crimley testified that she had recognized many of the individuals in the photographs from having seen them in her neighborhood and from having

looked at a yearbook from Caple's high school, from which the photographs had been taken. Accordingly, we cannot say that the trial court was required to find that Crimley's selection of the defendant's photograph was the product of unconscious transference.

To the extent that the defendant contends that the inclusion of similar individuals in the photographic array increased the chances that Crimley and Caple would engage in relative judgment, that is, that they would select the person who most closely resembled the shooter, the defendant has not explained why the inclusion of similar individuals would increase this risk rather than reduce it. See id., 143 (procedure is unnecessarily suggestive when "*variations* in array photographs . . . highlight [the] defendant to [the] point that it affects [the] witness' selection" [emphasis added]). We recognize that the risk that a witness will use relative judgment may be inherent in the use of a simultaneous photographic array. As we previously have indicated herein, however, we recently have reaffirmed that that fact does not render the array unnecessarily suggestive per se. See id., 156.

We also conclude that the trial court reasonably found that the failure of the police to use a double-blind procedure was not unnecessarily suggestive. In making this determination, the trial court was required to consider conflicting testimony by Crimley and Caple, on the one hand, and Coppola and Vasquez, on the other. Both Crimley and Caple testified that they had been pressured and influenced by Coppola and Vasquez to identify the defendant as the shooter. In contrast, Coppola and Vasquez testified that both witnesses had identified the defendant as the shooter without hesitation and that they had not pressured or influenced either witness. The trial court found that the testimony of Crimley and Caple was not credible and that the defendant had failed to produce any other credible evidence

that Coppola and Vasquez had influenced Crimley and Caple in any way.

Our review of the transcripts of the suppression hearing reveals that the testimony of Crimley and Caple was vague and inconsistent. In addition, both witnesses expressed fear about testifying as state's witnesses and did so reluctantly. Finally, nothing in the tape recordings of these witnesses' statements to the police supports a finding that the statements had been coerced. Accordingly, we conclude that the trial court reasonably discredited their testimony that the police had pressured and influenced them to identify the defendant as the shooter. See *State* v. *Lawrence*, 282 Conn. 141, 155, 920 A.2d 236 (2007) ("[i]t is well established that [i]t is within the province of the trial court, when sitting as the fact finder, to weigh the evidence presented and determine the credibility and effect to be given the evidence" [internal quotation marks omitted]). In light of Coppola's and Vasquez' unequivocal testimony that they had not pressured or influenced the witnesses in any way, and in the absence of any credible evidence to the contrary, we conclude that the court's finding that the police had not pressured or influenced the witnesses was not clearly erroneous. Furthermore, we cannot say that the trial court was bound to conclude that the failure of the police to use a double-blind procedure, without more, rendered the procedure unnecessarily suggestive.

Finally, we conclude that the trial court reasonably determined that the instruction form accompanying the photographic array also did not render the identification procedure unnecessarily suggestive. The form instructed the witnesses that the perpetrator might or might not be in the photographic array and that the police would continue to investigate the crime "whether [the witnesses] identif[ied] someone or not." Although the portion of the form that contained the statement "I

understand the instructions, have viewed the [photographs], and have identified [number] __," did not contain a comparable statement that the witness could choose if the witness determined that the perpetrator was not in the array, we have no basis to conclude that this omission necessarily would cause a witness who expressly had been instructed that the perpetrator might or might not be in the array to conclude that the perpetrator must be in the array. Accordingly, we conclude that the form was not unnecessarily suggestive.[8]

In light of our determination that the trial court properly found that none of the components of the identification procedure were unnecessarily suggestive, we must further conclude that the trial court properly found that the identification procedure, considered in its entirety, was not unnecessarily suggestive. Because this conclusion establishes the reliability of the identification procedure for purposes of the defendant's due process claim, the trial court properly denied the defendant's motion to suppress the identifications. See *State* v. *Marquez*, supra, 291 Conn. 168 (concluding that, because trial court had abused its discretion when it determined that identification procedure as whole was unnecessarily suggestive, due process inquiry was satisfied).

B

The defendant also challenges the trial court's denial of his motion to suppress the eyewitness identifications

[8] Undoubtedly, it would be preferable for the police to use a form containing a line on which the witness may indicate that the photograph of the perpetrator does not appear in the array. Additionally, we previously have taken note of the "theoretical and commonsense value of utilizing a blind administrator whenever practical." *State* v. *Marquez*, supra, 291 Conn. 156 n.33. Although we remain open to the possibility that considerations of fundamental fairness might, in a future case, cause us to conclude that one or more of these procedures is a necessary component of due process; see id.; this case does not present such an opportunity.

on the ground that the trial court improperly precluded him from presenting certain testimony from Dysart at the suppression hearing. Specifically, he contends that the trial court improperly precluded Dysart's testimony relative to the five "critical" factors that would bear on reliability of the identifications of the defendant by Crimley and Caple—the disguise effect; see footnote 6 of this opinion; the weapons focus effect, the effect of stress on accuracy of identification, the lack of correlation between confidence and accuracy, and the effect of collaboration on identifications. The defendant contends that the admission of this testimony would not have violated our holdings in *Kemp* and *McClendon* because those cases did not impose a blanket prohibition on such testimony and that the underlying assumption in those cases—that expert testimony is not necessary regarding this issue because such matters are common knowledge—has been undermined by more recent scientific literature. Although we are mindful of the significant issues that the defendant's claim implicates, for the various reasons that follow, we conclude that this is an improper case in which to address the merits of this claim.

First and foremost, our conclusion in part I A of this opinion that the trial court properly found that the identification procedure was not unnecessarily suggestive is dispositive of the defendant's due process claim. Under well settled law, there is no need to reach the second part of the two-pronged inquiry once the defendant has failed to meet the first prong.[9] See *Manson* v. *Brathwaite*, supra, 432 U.S. 107 ("[T]he first inquiry [is] whether the police used an impermissibly suggestive [identification] procedure . . . . *If so*, the second

[9] The defendant acknowledges the propriety of this framework in his analysis of his due process claim, stating that the court must "determine the reliability of the identification *once it has been determined to be unnecessarily suggestive* . . . ." (Emphasis added.)

inquiry is whether, under all the circumstances that suggestive procedure gave rise to a substantial likelihood of irreparable misidentification." [Emphasis added.]); see also *State* v. *Mitchell*, 204 Conn. 187, 201, 527 A.2d 1168, cert. denied, 484 U.S. 927, 108 S. Ct. 293, 98 L. Ed. 2d 252 (1987) (stating same approach); *State* v. *Hinton*, 196 Conn. 289, 292–93, 493 A.2d 837 (1985) (same); *State* v. *Theriault*, supra, 182 Conn. 371–72 (same). Accordingly, this court consistently has declined to consider the reliability of the identification if we have concluded that the procedure was not unnecessarily suggestive. See, e.g., *State* v. *Randolph*, 284 Conn. 328, 388 n.19, 933 A.2d 1158 (2007) ("[i]n light of [our] conclusion [that the identification was not unnecessarily suggestive], we need not address whether the identification was nevertheless reliable based on an examination of the totality of the circumstances" [internal quotation marks omitted]); *State* v. *Gant*, 231 Conn. 43, 70, 646 A.2d 835 (1994) ("[w]e conclude that the challenged procedure was not unnecessarily suggestive and thus we need not reach the question of the identification's independent reliability"), cert. denied, 514 U.S. 1038, 115 S. Ct. 1404, 131 L. Ed. 2d 291 (1995); *State* v. *Vaughn*, 199 Conn. 557, 565, 508 A.2d 430 (declining to address reliability of identification because photographic array was not unnecessarily suggestive), cert. denied, 479 U.S. 989, 107 S. Ct. 583, 93 L. Ed. 2d 585 (1986); see also *State* v. *Lindstrom*, 46 Conn. App. 810, 813, 702 A.2d 410 ("[a] reviewing court need reach only the second prong of this test if the trial court has made a finding that the original identification procedure was unnecessarily suggestive"), cert. denied, 243 Conn. 947, 704 A.2d 902 (1997). In the present case, the trial court considered Dysart's testimony as to her opinion that the identification procedures were unduly suggestive. Her excluded testimony in connection with the reliability of the eyewitnesses' identification, there-

fore, was, in essence, rendered purely academic by virtue of the trial court's reasonable determination that the identification procedure was not unduly suggestive.

Second, even if we were prepared to deviate from this established framework, the nature of the excluded testimony in light of the facts of the present case makes it clear that it is not an appropriate case to reconsider the evolving jurisprudence in this area of the law. That is because, regardless of whether the trial court's failure to entertain the excluded testimony constituted an abuse of discretion under the particular circumstances of this case, no possible harm flowed from that decision. See *State* v. *DeJesus*, 260 Conn. 466, 485, 797 A.2d 1101 (2002) (stating in context of challenge to exclusion of defendant's expert witness that, "[u]nder the current and long-standing state of the law in Connecticut, the burden to prove the harmfulness of an improper [nonconstitutional] evidentiary ruling is borne by the defendant" [internal quotation marks omitted]); *State* v. *Cavell*, 235 Conn. 711, 721, 670 A.2d 261 (1996) (stating same principle). Although the testimony that the trial court refused to consider may well have shed some light on the risk of a possible misidentification, under the facts and circumstances presented in this case, there simply is no reasonable likelihood that the testimony would have caused the court to suppress the identifications as manifestly untrustworthy. As we previously have noted, Caple had attended high school with the defendant and had known him for more than three years. Crimley had observed the defendant at close range when he passed her on the sidewalk, and there is nothing in the record to indicate that, at that time, Crimley saw the defendant in possession of a weapon or otherwise was under stress. Indeed, on cross-examination, Dysart acknowledged that the theories about which she had testified were cast in general

terms and that she could not say whether they invalidated the identifications at issue in this particular case.

The trial court's ruling precluding Dysart's proffered testimony on the five factors relating to the second prong of the due process test also was harmless for another, more elemental, reason. Because the court heard that testimony as part of the defendant's proffer and, thereafter, concluded that those factors were common knowledge, the court necessarily considered those five factors and gave them whatever weight it deemed appropriate. Indeed, the trial court expressly found that the witnesses had not collaborated with each other and, further, that, because Caple and Crimley had observed the shootings merely as witnesses and not as victims, they were not under sufficient stress to render their identifications of the defendant so suspect as to be inadmissible. Therefore, the defendant could not prevail on his claim that he is entitled to a new trial as a result of his inability to present the precluded portion of Dysart's testimony at the suppression hearing. It is not this court's practice to overrule cases when it would have no effect on the case at hand. See *State* v. *Brown*, 279 Conn. 493, 527, 903 A.2d 169 (2006) (declining to revisit court's holding in prior case when holding did not apply to claim at issue); *State* v. *Rhodes*, 248 Conn. 39, 50, 726 A.2d 513 (1999) (declining to revisit court's prior case law because defendant could not prevail even under new standard he had proposed).

We are keenly aware of the concerns raised by the defendant and the amicus regarding the evolving jurisprudence regarding the admissibility of expert testimony on the reliability of eyewitness identifications. This court first addressed that issue nearly twenty-five years ago. In *State* v. *Kemp*, supra, 199 Conn. 477, this court determined that the trial court properly had precluded expert testimony at trial to impeach the reliability of eyewitnesses who had identified the defendant

as the perpetrator, reasoning that "the reliability of eyewitness identification is within the knowledge of jurors and expert testimony generally would not assist them in determining the question . . . [and that] [s]uch testimony is . . . disfavored because . . . it invades the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony." (Citation omitted; internal quotation marks omitted.) This court reaffirmed that view in *State* v. *McClendon*, supra, 248 Conn. 572.[10]

The defendant and the amicus point out that, since *McClendon*, there have been more extensive studies on the issue of identification evidence, which indicate, inter alia, that: eyewitness memory is more malleable and susceptible to error than generally has been realized; and many different factors can adversely affect the reliability of eyewitness identifications, and the average person either is not aware of those factors or does not appreciate the extent to which they play a role in undermining the accuracy of identifications. The defendant and the amicus contend that these studies show

[10] We note that the proffered experts' testimony in those cases was not substantially different than Dysart's precluded testimony in the present case. The expert witness in *Kemp* was prepared to explain to the jury that: "(1) stress, particularly stress during an incident involving violence by a weapon, may decrease the reliability of the identification; (2) memory is not a recording device which accurately records an event and does not change over time; (3) the identification process is affected by post-event information learned by a witness; (4) and the level of certainty demonstrated by a person does not reflect a corresponding level of accuracy." (Internal quotation marks omitted.) *State* v. *Kemp*, supra, 199 Conn. 475. In *McClendon*, the expert was prepared to testify "among other things, that the confidence of an eyewitness does not correlate to the accuracy of observation, that variables such as lighting, stress and time to observe have an impact on accuracy, that leading questions and the repetition of testimony can increase an eyewitness' confidence but not accuracy, that people remember faces best when they analyze many features and characteristics of the face rather than just one, that leading police questions can alter memories, and that the most accurate descriptions are given immediately after a crime." *State* v. *McClendon*, supra, 248 Conn. 586–87.

that most of the factors that reduce or undermine the accuracy of eyewitness identifications are not only not within the common knowledge and experience of jurors, but indeed are counterintuitive. See, e.g., S. Kassin et al., "On the 'General Acceptance' of Eyewitness Testimony Research: A New Survey of Experts," 56 Am. Psychologist 405, 412–13 (2001); R. Schmechel et al., "Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence," 46 Jurimetrics J. 177, 195 (2006). As a consequence of this fact, the defendant and the amicus contend that courts have recognized a growing trend to permit expert testimony on factors that have been shown to reduce or undermine the accuracy of eyewitness identifications when those factors bear upon the particular identification at issue. See *United States* v. *Rodriguez-Felix*, 450 F.3d 1117, 1124–25 (10th Cir. 2006) (citing cases); *United States* v. *Smithers*, 212 F.3d 306, 312 n.1, 316 (6th Cir. 2000).

This sea change has persuaded the concurring justices in the present case that it is appropriate in the present case to overrule *Kemp* and *McClendon*, despite the fact that the effect of any such ruling would be academic in the present case. In addition to the reasons we previously have set forth, however, we have more fundamental concerns as to why it is not appropriate to reach this issue in the present case. First, *McClendon* and *Kemp* both involved the trial court's exclusion of expert testimony *before the jury*, not evidence proffered for the trial court's consideration at a suppression hearing. *State* v. *McClendon*, supra, 248 Conn. 588; *State* v. *Kemp*, supra, 199 Conn. 476. The underlying concerns in those cases related specifically to the jury's role at trial—that expert testimony was unnecessary to address a matter within a juror's common knowledge and that such testimony would invade the province of the jury to determine what weight to give to the eyewitness' testimony. At a suppression hearing, a court

is required only to determine the due process question of whether the eyewitness identifications are so lacking in reliability as to be inadmissible. See *State* v. *Ramsundar*, 204 Conn. 4, 13, 526 A.2d 1311 ("[t]he exclusion of evidence from the jury is . . . a drastic sanction, one that is limited to identification testimony which is manifestly suspect" [internal quotation marks omitted]), cert. denied, 484 U.S. 955, 108 S. Ct. 374, 98 L. Ed. 2d 252 (1987). Thus, the trial court serves a constitutional gatekeeping function rather than as finder of fact making a credibility assessment of the eyewitness. Therefore, whether it is an abuse of discretion for a trial court to prohibit expert testimony at trial, and if so, whether the reasoning underlying that determination would have equal application to the issue at hand present different issues and different concerns. Indeed, as we explain in part I C of this opinion, the defendant never sought to introduce Dysart's testimony at trial. Accordingly, this does not appear to be an appropriate case in which to decide whether to overrule cases involving the admissibility of expert identification testimony before lay jurors.

Second, the proper use of this expert testimony calls into question the soundness of the test set forth by the United States Supreme Court in *Neil* v. *Biggers*, 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), by which trial courts determine whether an identification can be deemed reliable despite a finding of unnecessary suggestiveness. Under the *Biggers* test, the trial court considers "whether under the 'totality of the circumstances' the identification was reliable . . . . [T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the

length of time between the crime and the confrontation." Id., 199–200. As is self-evident, several of these considerations relate to the assumptions that the studies have called into question. Therefore, the studies necessarily raise the question as to whether this framework continues to have merit. See, e.g., *State* v. *Dubose*, 285 Wis. 2d 143, 163–66, 699 N.W.2d 582 (2005) (concluding that, in light of studies that undermine reliability factors examined under *Biggers* and *Manson*, court no longer would analyze reliability prong after determining that show-up procedure was unnecessarily suggestive and only would consider whether procedure was necessary); see also *State* v. *Ledbetter*, supra, 275 Conn. 564–69 (noting studies relied on by defendant that criticize *Biggers* factors and fact that other states had abandoned test under their state constitutions, but declining to abandon test under our constitution). These serious concerns may need to be considered when determining whether the expert testimony on this issue properly can be presented to the court in a suppression hearing. Therefore, while we are open to reconsidering *Kemp* and *McClendon* in an appropriate case, the present case, in which the legal question is purely academic to the outcome and arises in a different context than those cases, is not such a case. See *State* v. *Samuels*, 273 Conn. 541, 555, 871 A.2d 1005 (2005) (rejecting state's argument, based on academic literature, that this court should adopt different constancy of accusation rule when victim is child; that issue was not relevant to court's determination of narrower issue before it as to whether testimony based on postcomplaint reports that victim had made to constancy witnesses should be admitted into evidence).

## C

We next address the defendant's claim that the trial court improperly barred him from adducing that same

expert testimony at trial. We decline to review this claim because it was not preserved.

The following additional facts are relevant to our resolution of this claim. As we have noted, when the trial court issued its ruling that it would not allow certain parts of Dysart's testimony at the suppression hearing, the court made it clear that its ruling applied only to that hearing.[11] Thereafter, at trial, the defendant made a motion requesting that Dysart be permitted to provide testimony concerning the four factors pertaining to the reliability of eyewitness identifications procedures about which the trial court had allowed Dysart to testify at the suppression hearing. The trial court granted the defendant's motion. With respect to the other five factors about which the trial court precluded Dysart's testimony at the suppression hearing, however, the defendant never renewed his request that Dysart be permitted to testify at trial with respect to those factors. In fact, the defendant did not call Dysart as a trial witness at all. Because the defendant did not seek a ruling as to whether Dysart would be permitted to testify about the five additional factors at trial, the court did not address that issue and, consequently, there is no ruling on the admissibility of those factors for this court to review. It is axiomatic that the defendant is not entitled to appellate review of this unpreserved claim. See, e.g., *State* v. *King,* 289 Conn. 496, 502, 958 A.2d 731 (2008) (defendant not entitled to review of unpreserved nonconstitutional claim); see also Practice Book § 60-5 (appellate court "shall not be bound to

---

[11] The trial court stated that it wanted "to make it clear for the record, whatever [the court is] ruling here with respect to topics or admissibility is . . . only with respect to the motion . . . to suppress where the court is both the finder of fact and the . . . ruler on the legal issues." The court further stated: "Obviously, there may be . . . some arguments that need not be repeated, if and when that testimony is offered at trial. But [the court] just want[s] the record to be clear that at this point [it is] only ruling on admissibility, as to the hearing before [it]."

consider a claim unless it was distinctly raised at the trial").

Moreover, it is reasonable to conclude that the defendant's decision not to call Dysart as a trial witness was a tactical one predicated on the concern that to do so might detract from the defendant's claim that Crimley and Caple had not made a good faith but mistaken identification of the defendant as the shooter but, rather, had been coerced by the police into identifying the defendant. "Our rules of procedure do not allow a defendant to pursue one course of action at trial and later, on appeal, argue that a path he rejected should now be open to him. . . . [Moreover, an] appellant cannot create a reviewable claim because his appellate counsel disagrees with the strategy of his trial counsel." (Internal quotation marks omitted.) *State* v. *Reynolds*, 264 Conn. 1, 207, 824 A.2d 611 (2003), cert. denied, 541 U.S. 908, 124 S. Ct. 1614, 158 L. Ed. 2d 254 (2004).

In support of his claim that he should not be denied appellate review of his claim, the defendant maintains that he reasonably believed that, when the trial court ruled on the admissibility of Dysart's testimony for purposes of the suppression hearing, the court intended for that ruling to be controlling at trial. The defendant points to the facts that the trial court referred repeatedly to the jury in its ruling at the suppression hearing[12] and that the trial court stated that, "there may be . . . some arguments that need not be repeated, if and when that testimony is offered at trial." We disagree. The record indicates that the trial court's references to the jury in

---

[12] For example, the trial court stated that: "juries are not without a general understanding of these principles"; "[t]he jury must have the opportunity to assess the witness' credibility on the basis of what is presented . . . at trial"; "unconscious transference . . . may be something beyond the scope of knowledge of an average juror"; and "the reliability of [identification testimony by collaborating witnesses] is something that a jury can analyze on [the] basis of common experience and common sense."

its ruling resulted from the court's reliance on case law concerning the admissibility of expert testimony, an issue that generally involves the admissibility of such testimony at a jury trial. Moreover, the court's clear and unequivocal statement that it would be willing to reconsider its ruling if the defendant were to make such a request in advance of trial; see footnote 11 of this opinion; reflects that its statement that the parties would not be required to repeat all of their arguments if the defendant was to renew his request to call Dysart as a witness at trial simply indicated, first, that the defendant did not need to make a second, identical offer of proof, and second, that a full hearing on the issue might not be necessary.

To the extent that the defendant asserts that any such renewed motion would have been futile because the trial court already had indicated how it would rule on the request, we also disagree. The fact that the trial court expressly limited its initial ruling to the admissibility of the testimony at the suppression hearing reflects the court's recognition of the difference between the suppression hearing and trial. As we have explained in part I B of this opinion, at the suppression hearing, the court was required only to rule on the due process question of whether the eyewitness identifications were so lacking in reliability as to be inadmissible; at trial, the jury was required to decide what weight to give the identifications. Because the former determination is less likely to be dependent upon the proffered expert testimony than the latter determination, the court might have decided to permit the testimony at trial despite its refusal to do so for purposes of the suppression hearing. In any event, we will not presume that it would have been futile for the defendant to have renewed his motion to suppress in view of the fact that the trial court essentially invited the defendant to do so. Accordingly, we reject this claim.

## II

We next address the defendant's claim that the trial court improperly failed to disclose all relevant materials contained in Crimley's psychiatric records, which the trial court had reviewed in camera. We disagree.

The following additional facts and procedural history are relevant to this claim. At the suppression hearing, the defendant filed a motion for an in camera review of Crimley's psychiatric records for the purpose of determining whether the records contained any information that would be probative of Crimley's capacity to observe, recollect and relate the events surrounding the murder. The trial court granted the motion and, upon reviewing the records, determined that several documents relating to Crimley's intellectual status arguably were relevant for impeachment purposes. The court marked those documents as a court exhibit and disclosed them to the defendant, after the state had obtained Crimley's consent to do so. The court also determined that the remainder of the documents were not relevant to Crimley's competence to testify and ordered that they be sealed and preserved for appellate review.

We begin with the applicable standard of review. "[General Statutes] § 52-146e spreads a veil of secrecy over communications and records relating to the diagnosis or treatment of a patient's mental condition. With certain exceptions not pertinent to the present discussion, the statute provides that no person may disclose or transmit any communications and records . . . to any person, corporation or governmental agency without the consent of the patient or his authorized representative. [General Statutes § 52-146e (a)]. The broad sweep of the statute covers not only disclosure to a defendant or his counsel, but also disclosure to a court

even for the limited purpose of an in camera examination. . . .

"A criminal defendant has a constitutional right to cross-examine state witnesses, however, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. . . . Thus, in some instances, a patient's psychiatric privilege must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility. . . . The defendant's right of cross-examination does not, however, allow him to discredit and impeach in whatever way, and to whatever extent, the defense might wish. . . . We have therefore directed trial courts to engage in a specific procedure designed to accommodate this inherent tension. . . .

"In *State* v. *Esposito*, [192 Conn. 166, 471 A.2d 949 (1984)], we set forth the following procedure for the disclosure of confidential records. If . . . the claimed impeaching information is privileged there must be a showing that there is reasonable ground to believe that the failure to produce the information is likely to impair the defendant's right of confrontation such that the witness' direct testimony should be stricken. Upon such a showing the court may then afford the state an opportunity to secure the consent of the witness for the court to conduct an in camera inspection of the claimed information and, if necessary, to turn over to the defendant any relevant material for the purposes of cross-examination. If the defendant does make such showing and such consent is not forthcoming then the court may be obliged to strike the testimony of the witness. If the consent is limited to an in camera inspection and such inspection, in the opinion of the trial judge, does not disclose relevant material then the resealed record is

to be made available for inspection on appellate review. If the in camera inspection does reveal relevant material then the witness should be given an opportunity to decide whether to consent to release of such material to the defendant or to face having her testimony stricken in the event of refusal. Id., 179–80." (Citations omitted; internal quotation marks omitted.) *State* v. *Kemah*, 289 Conn. 411, 424–26, 957 A.2d 852 (2008). "Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused." (Internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 381, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 94, 163 L. Ed. 2d 110 (2005).

Our in camera review of Crimley's psychiatric records satisfies us that the trial court did not abuse its discretion in concluding that the records that it did not disclose to the defendant either were not relevant to Crimley's capacity to observe, recollect or narrate the events surrounding the murder or were cumulative of the records that the court disclosed to the defendant. Accordingly, we reject this claim.

### III

We next address the defendant's claims that the trial court improperly denied the defendant's motion for a mistrial on the ground that the state purportedly violated the trial court's sequestration order. The defendant also contends that the court improperly denied his motion to strike the testimony of the state's witness who violated that order. We disagree with these claims.

The following additional facts and procedural history are necessary to our resolution of this claim. At the beginning of the suppression hearing, the state moved for the "sequestration of all witnesses during the suppression hearing and during the trial . . . ." The trial

court granted the motion pursuant to Practice Book § 42-36.[13] Shortly thereafter, the defendant brought to the court's attention that he also had filed a motion for sequestration of witnesses.[14] The trial court then stated: "It cuts both ways, the motion is granted. No direct or indirect communication between any of the witnesses."

At trial, the defendant stated that he intended to raise a third party culpability defense. The defendant made an offer of proof in which he indicated that an acquaintance of his, Shaniah Outlaw, would testify that Darrell Mayes had admitted to her that he had shot the victim. In addition, the defendant asserted that an acquaintance of Caple, Ricky Freeman, would testify that Caple had told him on the night of the murder that Mayes and Lawrence Mayberry were responsible for the murder.

Thereafter, the state called Detective Vasquez as a witness. On cross-examination, Vasquez testified that he had received information that Mayes and Mayberry had been involved in the murder and that he had written a report about the information on February 28, 2006. On redirect examination, Vasquez testified that he had received the information from Freeman. On recross-examination, Vasquez testified that the investigation into the murder was ongoing, but only with respect to an unidentified person whom Crimley had seen with the defendant at the time of the murder.

On the next day of trial, the defendant filed a motion for a mistrial and a motion to strike Vasquez' testimony. Counsel for the defendant stated that she had learned that Vasquez had interviewed Outlaw after the court

---

[13] Practice Book § 42-36 provides: "The judicial authority upon motion of the prosecuting authority or of the defendant shall cause any witness to be sequestered during the hearing on any issue or motion or during any part of the trial in which such witness is not testifying."

[14] The defendant's motion provided in its entirety: "Pursuant to Practice Book [§ 876, now § 42-36], the defendant in the above captioned matter moves this [c]ourt sequester all witnesses."

granted the sequestration order and before Vasquez had testified. Defense counsel claimed that Vasquez had thereby violated the sequestration order and that his conduct had prejudiced the defendant because Vasquez had encouraged Outlaw not to testify and because his interview of Outlaw had shaped Vazquez' testimony. Specifically, defense counsel argued that Vasquez had testified that the ongoing investigation of the murder related only to the person who had accompanied the defendant on the day of the murder, when Vasquez knew from his interview of Outlaw that Mayes had admitted to being the shooter.

In response, the assistant state's attorney argued that Vasquez had not mentioned Outlaw in his testimony, that there was no evidence that Vasquez had shaped his testimony as a result of his interview with Outlaw and that there was no evidence that he had encouraged Outlaw not to testify. In fact, the state argued, Outlaw had denied to Vasquez that she had ever stated that someone other than the defendant had been involved in the murder and she had refused to comply with a subpoena before Vasquez interviewed her. Moreover, Vasquez had prepared a written report of his interview of Outlaw and had provided it promptly to the defendant.

The trial court denied the defendant's motion for a mistrial and his motion to strike Vasquez' testimony. The court stated that "[t]he sequestration order here means that there should be no contact between witnesses and they should not be present in the courtroom. Sequestration does not preclude the prosecution from talking to a potential witness, any more than it does the defendant." The trial court also noted that Outlaw had not yet testified as a witness and that any contact with Vasquez could be explored during her testimony. Finally, the court stated that any claim that Outlaw had

become uncooperative because Vasquez had interviewed her was "rank speculation."

Outlaw testified at trial that she had overheard Mayes stating that he had shot the victim. Outlaw denied that she had told Vasquez that she had never told anyone that Mayes had admitted being the shooter. Thereafter, Vasquez contradicted Outlaw when he testified on rebuttal that Outlaw had told him that she had never told anyone that Mayes admitted killing the victim. The defendant then requested that he be allowed to present surrebuttal evidence, in the form of testimony by Outlaw's mother, who had been present during Vasquez' interview of Outlaw, that Outlaw had told Vasquez that she had overheard Mayes admitting that he had shot the victim. The state objected to the admission of this testimony, and the trial court sustained the objection.

On appeal, the defendant claims that the trial court improperly denied his motion for a mistrial and his motion to strike Vasquez' testimony because Vasquez had violated the sequestration order by interviewing Freeman and Outlaw. He further claims that the impropriety was harmful because Vasquez had tailored his rebuttal testimony to Outlaw's testimony. The state responds that the defendant's claims that Vasquez violated the sequestration order by interviewing Freeman and that Vasquez' rebuttal testimony was tailored to the statements that Outlaw made during the interview are not reviewable because the defendant did not raise them at trial. The state further contends that Vasquez did not violate the sequestration order by interviewing Outlaw because Outlaw had not yet testified at the time of the interview. Finally, the state contends that, even if Vasquez violated the sequestration order, the defendant has failed to show prejudice.

We agree with the state that the defendant's claim that Vasquez violated the sequestration order by inter-

viewing Freeman was not preserved because he failed to raise the claim at trial and, therefore, we decline to review it. See, e.g., Practice Book § 60-5; *State* v. *King*, supra, 289 Conn. 502. With respect to the defendant's contention that Vasquez' rebuttal testimony was tailored to Outlaw's statements to Vasquez during the interview, we conclude that the claim was preserved because the defendant previously had filed a motion to strike the testimony given by Vasquez during the state's case and the trial court had denied that motion. Because the reasons given by the trial court were equally applicable to any future rebuttal testimony by Vasquez, it was reasonable for the defendant to have believed that the trial court's ruling applied to such testimony. Accordingly, we conclude that the claim is reviewable.

We turn, therefore, to the applicable standard of review. "The standard for review of an action upon a motion for a mistrial is well established. While the remedy of a mistrial is permitted under the rules of practice, it is not favored. [A] mistrial should be granted only as a result of some occurrence upon the trial of such a character that it is apparent to the court that because of it a party cannot have a fair trial . . . and the whole proceedings are vitiated. . . . If curative action can obviate the prejudice, the drastic remedy of a mistrial should be avoided. . . . On appeal, we hesitate to disturb a decision not to declare a mistrial. The trial judge is the arbiter of the many circumstances which may arise during the trial in which his function is to assure a fair and just outcome. . . . The trial court is better positioned than we are to evaluate in the first instance whether a certain occurrence is prejudicial to the defendant and, if so, what remedy is necessary to cure that prejudice. . . . The decision whether to grant a mistrial is within the sound discretion of the trial court." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 702, 911 A.2d 1055 (2006).

In determining the scope and application of a sequestration order granted pursuant to Practice Book § 42-36, we are guided by the principles of statutory interpretation. See, e.g., *Pitchell* v. *Hartford*, 247 Conn. 422, 432, 722 A.2d 797 (1999) (rules of statutory construction apply with equal force to rules of practice). "Our fundamental objective in interpreting a rule of practice is to ascertain and give effect to the intent of the drafters." *Dartmoor Condominium Assn., Inc.* v. *Guarco*, 111 Conn. App. 566, 569, 960 A.2d 1076 (2008). "The interpretation of the rules of practice presents a question of law, over which our review is plenary." *Gilbert* v. *Beaver Dam Assn. of Stratford, Inc.*, 85 Conn. App. 663, 671, 858 A.2d 860 (2004), cert. denied, 272 Conn. 912, 866 A.2d 1283 (2005).

In construing the scope and application of § 42-36, we do not write on a blank slate. This court previously has explained that "[t]he right to have witnesses sequestered is an important right that facilitates the truth-seeking and fact-finding functions of a trial. . . . Sequestration serves a broad purpose. It is a procedural device that serves to prevent witnesses from tailoring their testimony to that of earlier witnesses; it aids in detecting testimony that is less than candid and assures that witnesses testify on the basis of their own knowledge." (Citations omitted; internal quotation marks omitted.) *State* v. *Nguyen*, 253 Conn. 639, 649, 756 A.2d 833 (2000); see also *State* v. *Falby*, 187 Conn. 6, 26–27, 444 A.2d 213 (1982) ("[t]he obvious purpose of sequestering a witness while another is giving his testimony is to prevent the one sequestered from shaping his testimony to corroborate falsely the testimony of the other" [internal quotation marks omitted]). "In essence, [sequestration] helps to ensure that the trial is fair. . . . A trial court must take full account of the significant objectives advanced by sequestration in discerning the proper scope of a sequestration order." (Citations omit-

ted; internal quotation marks omitted.) *State* v. *Nguyen*, supra, 650.

In *State* v. *Brown*, 33 Conn. App. 339, 635 A.2d 861 (1993), rev'd on other grounds, 232 Conn. 431, 656 A.2d 997 (1995), the Appellate Court held that, when a sequestration order has been granted pursuant to General Statutes § 54-85a,[15] the language of which is substantially identical to Practice Book § 42-36; see footnote 13 of this opinion; "only a witness who was present in the courtroom 'during the hearing on any issue or motion or any part of the trial of such prosecution in which he is not testifying' would violate the sequestration order." *State* v. *Brown*, supra, 347–48. Accordingly, the Appellate Court concluded that "no violation of the sequestration order occurred when a detective showed a witness some pictures, even if the detective was also a witness." Id., 348. In a later case, this court expanded upon the holding of *Brown* and concluded that "the primary objective of a sequestration order [granted pursuant to Practice Book § 876, now § 42-36] is undermined, not only when a prospective witness hears the testimony of a prior witness firsthand, but also through the disingenuous strategy of effectively transmitting a prior witness' testimony to a prospective witness via a third party." *State* v. *Nguyen*, supra, 253 Conn. 651.

"A violation of a sequestration order does not automatically require a new trial. . . . The controlling consideration is whether the defendant has been prejudiced by the violation. . . . The burden rests on the party requesting the sequestration to show that the violation was prejudicial. . . . If the prejudice resulting from the violation is likely to have affected the jury's verdict, a

[15] General Statutes § 54-85a provides: "In any criminal prosecution, the court, upon motion of the state or the defendant, shall cause any witness to be sequestered during the hearing on any issue or motion or any part of the trial of such prosecution in which he is not testifying."

new trial must be ordered."[16] (Citations omitted.) *State* v. *Robinson*, 230 Conn. 591, 599, 646 A.2d 118 (1994).

We conclude that the trial court did not abuse its discretion when it denied the defendant's motion for a mistrial on the ground that Vasquez had violated the sequestration order when he interviewed Outlaw. As we have indicated herein, the primary purpose of a sequestration order issued pursuant to § 42-36 is to "prevent witnesses from tailoring their testimony to that of *earlier witnesses* . . . ." (Emphasis added; internal quotation marks omitted.) *State* v. *Nguyen*, supra, 253 Conn. 649. Thus, a sequestration order is violated only when a prospective witness is in the courtroom during the testimony of another witness; see *State* v. *Brown*, supra, 33 Conn. App. 347–48; or when a prospective witness learns of the testimony of a prior witness from a third party. *State* v. *Nguyen*, supra, 651. Although we recognize that discussions between prospective witnesses prior to their testimony may allow the witnesses to tailor their testimony, a sequestration order issued pursuant to § 42-36 does not necessarily prohibit such discussions.[17] Because Outlaw had not yet testified

[16] The defendant in the present case urges this court to adopt a new rule under which the burden is on the party who violated the sequestration order to prove that the violation was harmless, citing as support *United States* v. *Jackson*, 60 F.3d 128, 135 (2d Cir.), cert. denied, 516 U.S. 980, 116 S. Ct. 488, 133 L. Ed. 2d 414 (1995). Because we conclude that the trial court properly concluded that Vasquez had not violated the sequestration order, we need not address this claim.

[17] We recognize that, when it granted the defendant's motion for sequestration, the trial court stated that there should be no "direct or indirect communication between any of the witnesses" and that, when it denied the defendant's motion for a mistrial, it similarly stated that "there should be no contact between witnesses and they should not be present in the courtroom." In light of the fact that both the state and the defendant filed their motions for sequestration pursuant to § 42-36, and in light of the trial court's statement that "[s]equestration does not preclude the prosecution from talking to a potential witness, any more than it does the defendant," however, we understand its ruling to mean that, in accordance with *Nguyen*, the witnesses should not have direct contact with each other in the courtroom and a witness should not be informed about another witness' testimony

when Vasquez testified at the suppression hearing and during the state's case at trial, and because there is no evidence that Vasquez knew how Outlaw had testified when he testified on rebuttal during the defendant's case, we conclude that the trial court properly found that Vasquez had not violated the sequestration order.[18] We therefore conclude that the trial court did not abuse its discretion when it denied the defendant's motion for a mistrial. For the same reasons, we conclude that the trial court did not abuse its discretion when it denied the defendant's motion to strike Vasquez' testimony. See *State* v. *Popeleski*, 291 Conn. 769, 774, 970 A.2d 108 (2009) ("[w]e review the trial court's decision to admit evidence, if premised on a correct view of the law . . . for an abuse of discretion").

## IV

Finally, we turn to the defendant's claim that the assistant state's attorney improperly argued with witnesses, commented on the credibility of defense witnesses and denigrated defense counsel during closing argument, thereby depriving the defendant of a fair trial.[19] Although we conclude that some of the conduct exceeded the bounds of proper conduct, we disagree that it deprived the defendant of a fair trial.

The record reveals the following additional facts relevant to the conduct by the assistant state's attorney

indirectly through a third party. Of course, we do not suggest that a court is barred from issuing a broader sequestration order if circumstances so require.

[18] We acknowledge that Vasquez interviewed Outlaw after Vasquez had testified at the suppression hearing. The defendant has made no claim, however, that Outlaw tailored her testimony to conform to Vasquez' testimony.

[19] The defendant also contends that the assistant state's attorney engaged in prosecutorial impropriety when she instructed Vasquez to interview Outlaw and Freeman because, according to the defendant, that instruction violated the sequestration order. In light of our conclusion in part III of this opinion that Vasquez' conduct did not constitute a violation of the sequestration order, this claim of prosecutorial impropriety must fail.

that the defendant contends constituted prosecutorial impropriety. During redirect examination of Caple, the assistant state's attorney engaged in the following exchange:

"[Assistant State's Attorney]: So, your testimony before this jury is that those police officers told you to say that [the victim] died in your arms twice; is that true?

"[Caple]: I practically lied to them police officers.

"[Assistant State's Attorney]: Now you lied to them, okay. And when . . . your voice broke with emotion as you were describing [the victim] dying in your arms twice . . .

"[Caple]: It never broke with emotion.

"The Court: The tape speaks for itself.

"[Assistant State's Attorney]: Was that a lie too, sir?

"[Caple]: It never broke with emotion. What emotion are you talking about? I don't get emotional for nothing.

"[Assistant State's Attorney]: You don't?

"[Caple]: No.

"[Assistant State's Attorney]: But you're afraid of me.

"[Caple]: I'm not afraid of you neither.

"[Assistant State's Attorney]: You're afraid of me and Mr.—

"[Caple]: I'm not afraid of you.

"[Assistant State's Attorney]:—[Dennis] Kelly [an investigator with the state's attorney's office].

"[Caple]: I'm not afraid of you. I'm not afraid of him."

After defense counsel objected that the assistant state's attorney was becoming argumentative, and the

trial court sustained the objection, the following exchange with Caple ensued:

"[Assistant State's Attorney]: So, you felt threatened by me, but you're not afraid of [the defendant]; isn't that what you're telling us?

"[Caple]: I'm not afraid of nobody.

"[Assistant State's Attorney]: A man that you saw kill [the victim] in cold—

"[Caple]: I didn't see that man kill nobody."

Defense counsel again objected, and the trial court sustained the objection. Defense counsel then stated, "I'd like a curative instruction or I'm going to move for a mistrial." The trial court immediately instructed the jury to disregard the assistant state's attorney's question as argumentative and improper. The court then excused the jury at the request of defense counsel, who moved for a mistrial on the ground that the assistant state's attorney had inflamed the jury, mischaracterized Caple's testimony and effectively testified that the defendant had killed the victim. The assistant state's attorney asserted that the questioning was proper because she had been engaged in "cross-examination of a hostile witness . . . ." When defense counsel responded that Caple never had been declared a hostile witness, the trial court stated that, although it previously had not made a ruling on the question, it now believed that Caple was a hostile witness.[20] The trial court then denied the motion for a mistrial, but agreed to give another curative instruction. When the jury returned, the trial court again instructed the jury that

[20] Traditionally, a party was not allowed to impeach his or her own witness unless the witness was shown to be hostile or adverse. See, e.g., *State* v. *Graham*, 200 Conn. 9, 15, 509 A.2d 493 (1986). This court has abandoned this rule, however, and has held that "the credibility of a witness may be impeached by the party calling [the witness] without a showing of surprise, hostility or adversity." Id., 17.

the assistant state's attorney's comment had been argumentative and improper, and that the jury should disregard it. The court also instructed the jury that the comment was not evidence and that the jury alone was the finder of fact. As part of its final instructions to the jury, the trial court again stated that, if "either attorney stated a personal opinion about whether the defendant is guilty or not guilty . . . [the jury] must disregard such opinion; those opinions are exclusively [the jury's] to make . . . ." In addition, the court instructed the jurors that they must "erase from [their] minds any unanswered questions by the attorneys or any of their comments during evidence or anything else I have stricken or told you to disregard."

During her cross-examination of Outlaw, the assistant state's attorney elicited testimony that the defendant's mother had bought lunch for Outlaw earlier in the day. The assistant state's attorney then asked, "Oh, she bought you lunch. What did you have?" Defense counsel objected to the question on grounds of relevance, and the trial court sustained the objection. Thereafter, the assistant state's attorney questioned Outlaw about her conduct after she claimed to have overheard Mayes admit that he shot the defendant.[21]

During her rebuttal closing argument following defense counsel's argument to the jury, the assistant state's attorney asked the jury to "take a reality break" when considering Outlaw's testimony and characterized Outlaw's credibility as "zilch." Defense counsel objected to this remark, and the trial court instructed the jury that it was the sole judge of a witness' credibil-

---

[21] The assistant state's attorney asked Outlaw: "And so as soon as you learned that somebody else was confessing to [the victim's shooting], you immediately contacted the police because your friend was in trouble, right?" When Outlaw responded, "[n]o," the assistant state's attorney asked her: "And you immediately contacted the state's attorney's office because you had very important information about this murder, right?"

ity.[22] The assistant state's attorney then stated, "You can find, if you'd like, that . . . Outlaw's credibility is zilch." Thereafter, she stated that the state's firearms expert "knows what he's talking about; he's been doing it a long time."

Throughout her rebuttal argument, the assistant state's attorney characterized the defendant's theories that Mayes was the real shooter and that the police had coerced Caple and Crimley to falsely identify the defendant as "absurd," "speculation and innuendo and fancy words," "clever," "creative," "desperate," "weak" and "[smoke and] mirrors." Defense counsel did not object to any of these remarks.

We begin our analysis by setting forth the applicable law regarding claims of prosecutorial impropriety. To prevail on such a claim, the defendant "must establish that the prosecutorial [impropriety] was so serious as to amount to a denial of due process . . . . In evaluating whether the [impropriety] rose to this level, we consider the factors enumerated by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987). . . . These factors include the extent to which the [impropriety] was invited by defense conduct or argument, the severity of the [impropriety], the frequency of the [impropriety], the centrality of the [impropriety] to the critical issues in the case, the strength of the curative measures adopted, and the strength of the state's case." (Citations omitted; internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 360–61, 897 A.2d 569 (2006).

"Prosecutorial [impropriety] may occur in the course of cross-examination of witnesses . . . and may be so clearly inflammatory as to be incapable of correction

---

[22] During its final instructions to the jury, the trial court again referred to "[the assistant state's attorney's] opinion on the testimony of some of the witnesses" and instructed the jury that it "must disregard that."

by action of the court. . . . In such instances there is a reasonable possibility that the improprieties in the cross-examination either contributed to the jury's verdict of guilty or, negatively, foreclosed the jury from ever considering the possibility of acquittal. . . . Moreover, prosecutorial [impropriety] of constitutional proportions may arise during the course of closing argument, thereby implicating the fundamental fairness of the trial itself . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Singh*, 259 Conn. 693, 700, 793 A.2d 226 (2002).

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial. Put differently, [impropriety] is [impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Warholic*, supra, 278 Conn. 361–62.

"[T]he touchstone of due process analysis in cases of alleged[ly] [harmful] prosecutorial [impropriety] is the fairness of the trial, and not the culpability of the prosecutor. . . . The issue is whether the prosecutor's [actions at trial] so infected [it] with unfairness as to make the resulting conviction a denial of due process. . . . In determining whether the defendant was denied a fair trial . . . we must view the prosecutor's [actions] in the context of the entire trial." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 32, 917 A.2d 978 (2007). "Just as the prosecutor's remarks must be gauged in the context of the entire trial, once a series of serious improprieties has been identified we must determine whether the totality of the improprieties leads to the conclusion that the defendant was deprived

of a fair trial. . . . Thus, the question in the present case is whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total of the improprieties. . . . Furthermore, whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any of the prosecutor's improper remarks."[23] (Citations omitted; internal quotation marks omitted.) *State* v. *Thompson*, 266 Conn. 440, 460, 832 A.2d 626 (2003).

"We are mindful throughout this inquiry, however, of the unique responsibilities of the prosecutor in our judicial system." (Internal quotation marks omitted.) *State* v. *Fauci*, supra, 282 Conn. 32. "[T]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel." (Internal quotation marks omitted.) *State* v. *Orellana*, 89 Conn. App. 71, 101, 872 A.2d 506, cert. denied, 274 Conn. 910, 876 A.2d 1202 (2005). "[I]t is

---

[23] This court previously has explained that we do not engage in the review of unpreserved claims of prosecutorial impropriety under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), because the consideration of the *Williams* prosecutorial impropriety factors duplicate, and, thus makes superfluous, a separate application of the *Golding* test. *State* v. *Warholic*, supra, 278 Conn. 361. The absence of an objection at trial, however, plays a significant role in the application of the *Williams* factors: "When defense counsel does not object, request a curative instruction or move for a mistrial, he presumably does not view the alleged impropriety as prejudicial enough to seriously jeopardize the defendant's right to a fair trial. . . . [Thus], the fact that defense counsel did not object to one or more incidents of [impropriety] must be considered in determining whether and to what extent the [impropriety] contributed to depriving the defendant of a fair trial and whether, therefore, reversal is warranted." (Internal quotation marks omitted.) Id.

improper for a prosecutor to tell a jury, explicitly or implicitly, that defense counsel is employing standard tactics used in all trials, because such argument relies on facts not in evidence and has no bearing on the issue before the jury, namely, the guilt or innocence of the defendant." (Internal quotation marks omitted.) Id., 102. "There is a distinction [however] between argument that disparages the integrity or role of defense counsel and argument that disparages a theory of defense. . . . Moreover, not every use of rhetorical language is improper." (Citation omitted; internal quotation marks omitted.) *State* v. *Salamon*, 287 Conn. 509, 558, 949 A.2d 1092 (2008); *State* v. *Warholic*, supra, 278 Conn. 363. "There is ample room, in the heat of argument, for the prosecutor to challenge vigorously the arguments made by defense counsel." *State* v. *Orellana*, supra, 103.

"The prosecutor may not express his own opinion, directly or indirectly, as to the credibility of the witnesses. . . . Nor should a prosecutor express his opinion, directly or indirectly, as to the guilt of the defendant. . . . Such expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position. . . . Moreover, because the jury is aware that the prosecutor has prepared and presented the case and consequently, may have access to matters not in evidence . . . it is likely to infer that such matters precipitated the personal opinions." (Internal quotation marks omitted.) *State* v. *Grant*, 286 Conn. 499, 546, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008). "[T]he state may argue [however] that its witnesses testified credibly, if such an argument is based on reasonable inferences drawn from the evidence. . . . Specifically, the state may argue that a witness has no motive to lie." (Citation omitted.) *State* v. *Warholic*, supra, 278 Conn. 365.

With these principles in mind, we address each of the claimed improprieties in turn. With respect to the assistant state's attorney's comment to Caple suggesting that he must be afraid of the defendant, "[a] man that [he] saw kill [the victim]," we agree that the comment was improper. That remark suggested that it was a matter of established fact that the defendant had shot the victim and that Caple had lied when he testified that the defendant had not shot the victim. See *State v. Grant*, supra, 286 Conn. 546 (prosecutor should not express opinion on credibility of witnesses or defendant's guilt). In addition, the remark suggested that it was the prosecutor's opinion the defendant was dangerous. See id. ("expressions of personal opinion are a form of unsworn and unchecked testimony, and are particularly difficult for the jury to ignore because of the prosecutor's special position" [internal quotation marks omitted]). Although the assistant state's attorney was entitled to impeach Caple, this remark was not a proper means by which to do so. Moreover, the remark was not invited by defense conduct or argument and it was central to the defendant's primary theory of defense that Caple and Crimley had given false statements to the police.

We also agree with the defendant that the assistant state's attorney's questions to Outlaw concerning what the defendant's mother had bought her for lunch and about her conduct after overhearing Mayes' confession was improper. This court does not condone the use of sarcasm during the examination of witnesses. See *State v. Rizzo*, 266 Conn. 171, 263, 833 A.2d 363 (2003) ("the use of needless sarcasm by the state's attorney [may call] upon the jurors' feelings of disdain, and [may send] them the message that the use of sarcasm, rather than reasoned and moral judgment, as a method of argument was permissible and appropriate for them to use").

The defendant also claims that the assistant state's attorney improperly characterized the defendant's theories of defense as "absurd," "speculation and innuendo and fancy words," "clever," "creative," "desperate," "weak" and "[smoke and] mirrors" during her rebuttal closing argument and that it was improper for the assistant state's attorney to suggest that the jury should "take a reality break" when considering Outlaw's testimony. Although we emphasize that prosecutors should not use language that is intended to belittle or denigrate the role of defense counsel, we conclude that these remarks were not directed to that role "by suggesting that defense counsel was engaging in typical defense tactics"; *State* v. *Orellana*, supra, 89 Conn. App. 102; but, instead, were directed at the specific arguments made by defense counsel in the present case and at the evidence supporting those arguments. See id., 103. We continue, however, to frown upon the use of the term "smoke screen," even as an isolated reference, as the variation of that term in the present case, because "it implie[s], to whatever degree, that defense counsel had not based his argument on fact or reason, but had intended to mislead the jury by means of an artfully deceptive argument." Id.; accord *State* v. *Salamon*, supra, 287 Conn. 559 ("the term 'smoke screen' is . . . problematic because it may be viewed as connoting an intent to deceive").

We conclude that the assistant state's attorney did not engage in prosecutorial impropriety when she stated that the state's firearms expert "knows what he's talking about; he's been doing it a long time." This isolated comment did not rise to the level of vouching for the credibility of a witness but, rather, was "an argument . . . based on reasonable inferences drawn from the evidence." *State* v. *Warholic*, supra, 278 Conn. 365.

Finally, with respect to the assistant state's attorney's statement that Outlaw's credibility was "zilch," the state concedes that this remark was improper. See *State* v. *Grant,* supra, 286 Conn. 546 ("[t]he prosecutor may not express his [or her] own opinion, directly or indirectly, as to the credibility of the witnesses" [internal quotation marks omitted]). The state also contends, however, that this impropriety, as well as any other improprieties that it does not concede, did not deprive the defendant of a fair trial. We agree.

The remarks that we have found were improper were isolated. The trial court gave strong curative instructions immediately after the improper comment to Caple that the jury must disregard the comment as argumentative and improper, that the comment was not evidence, and that the jury was the sole finder of fact. The court repeated much of this instruction in its final instructions to the jury. With respect to the comment on Outlaw's credibility, we note that the assistant state's attorney promptly corrected herself. We further note that Outlaw's testimony was not central to the defendant's primary theory of defense that Caple and Crimley falsely had identified the defendant as the shooter. Finally, for the reasons we previously have discussed, we note that the eyewitness identifications were strong evidence of the defendant's guilt. The eyewitness accounts were consistent with evidence found at the scene, two bicycles—the victim's and the one they claimed the defendant had abandoned—and four shell casings. Although the witnesses later recanted their identifications, they admitted to being fearful of testifying against the defendant. Accordingly, we conclude that the assistant state's attorney's comment did not violate the defendant's due process right to a fair trial.

The judgment is affirmed.

In this opinion ROGERS, C. J., and ZARELLA and McLACHLAN, Js., concurred.

NORCOTT, J., concurring. For the reasons that are artfully explained in his comprehensively researched concurring opinion, I agree wholeheartedly with Justice Palmer that the time has come to overrule our prior decisions in *State* v. *Kemp*, 199 Conn. 473, 507 A.2d 1387 (1986), and *State* v. *McClendon*, 248 Conn. 572, 730 A.2d 1107 (1999), to the extent that they be read as holding inadmissible expert testimony concerning the reliability of eyewitness identifications. I therefore join him in concluding that, with respect to reliability, the trial court improperly refused to admit into evidence the expert testimony of Jennifer Dysart introduced by the defendant, J'Veil Outing, at the hearing on his motion to suppress eyewitness identification testimony. I write separately, however, to recognize the validity of the majority's prudential concerns about whether this case presents us with the appropriate vehicle for overruling these flawed precedents.

I agree with the majority that this is not the *ideal* case for reconsidering these precedents, because: (1) under well established due process principles, we need not consider the reliability of the identification herein because it was obtained using a procedure that properly was found, after consideration of parts of Dysart's proffered testimony, not to be unnecessarily suggestive; see, e.g., *Manson* v. *Brathwaite*, 432 U.S. 98, 107, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977); and (2) there are preservation problems, namely, the defendant's failure to proffer Dysart's expert testimony into evidence at the subsequent jury trial.[1] Given, however, this court's "inherent

---

[1] I respectfully disagree with the majority's alternate conclusion that we need not address this issue because, in any event, the failure to admit Dysart's expert testimony would have been harmless error. Particularly in the evidentiary field, we previously have overruled prior case law without regard to the fact that the resulting evidentiary error turned out to be harmless. See *State* v. *Malave*, 250 Conn. 722, 740–43, 737 A.2d 442 (1999) (abandoning missing witness rule set forth in *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 165 A.2d 598 [1960], but concluding that trial court's

authority to change and develop the rules of evidence through case-by-case common-law adjudication"; *State* v. *DeJesus*, 288 Conn. 418, 454, 953 A.2d 45 (2008); as well as the hazards of gross injustice presented by *all*[2] eyewitness identification testimony, which are well documented in Justice Palmer's concurring opinion, I simply do not think it appropriate or wise to wait for the "right" record to come before us before we act to correct this dangerously outmoded body of case law. See, e.g., *State* v. *Salamon*, 287 Conn. 509, 520, 949 A.2d 1092 (2008) ("[t]he value of adhering to [past] precedent is not an end in and of itself . . . if the precedent reflects substantive injustice" [internal quotation marks omitted]). Accordingly, I join Justice Palmer's concurring opinion.

PALMER, J., with whom NORCOTT and VERTE-FEUILLE, Js., join, concurring. Although I agree with the majority that the murder conviction of the defendant, J'Veil Outing, must be affirmed, I disagree with the majority's refusal to reconsider and overrule this court's precedent concerning the admissibility of expert testimony on the reliability of eyewitness identifications. Beginning with *State* v. *Kemp*, 199 Conn. 473, 476–77, 507 A.2d 1387 (1986), this court consistently has concluded that expert testimony on the fallibility of eyewitness identifications is unnecessary and, therefore, inadmissible because it is a subject within the ken of the average juror. Although our holding in *Kemp* and its progeny have been thoroughly discredited by

---

missing witness instruction was harmless error on facts of case), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000); *George* v. *Ericson*, 250 Conn. 312, 327–28, 736 A.2d 889 (1999) (engaging in harmless error analysis after overruling evidentiary rule precluding testimony by nontreating physician).

[2] On this record, I need not consider separately the significant concerns that attend cross-racial eyewitness identifications in particular. See footnote 14 of Justice Palmer's concurring opinion.

empirical studies, and although eyewitness identification testimony, while highly convincing, is notoriously unreliable, the majority sidesteps the issue of the continued viability of our precedent in this area, even though neither party contends that we should avoid addressing this extremely important issue. In sum, the majority's refusal to address the issue is indefensible, first, because *Kemp* and its progeny authorize our trial courts to reject expert testimony on the reliability of eyewitness identifications for a reason that we now *know* is wholly insupportable and, second, because, as a result of those cases, criminal defendants are being denied their right to challenge meaningfully the reliability of eyewitness identification testimony. I therefore cannot join that portion of the opinion of the majority in which it declines to reach the merits of the defendant's claim that the trial court improperly precluded him from introducing into evidence, at the hearing on his motion to suppress eyewitness identification testimony, certain expert testimony concerning the reliability of such identifications.[1] Because, however, the trial court's denial of the defendant's request to introduce that expert testimony constituted harmless error, I concur in the result that the majority reaches.

The following facts, which are set forth generally in the majority opinion, are particularly relevant to this issue. Prior to trial, the defendant filed a motion to suppress the eyewitness identification testimony of two witnesses, Nadine Crimley and Ray Caple. The defendant informed the court and the state that he intended to present the testimony of Jennifer Dysart, an acknowledged expert on eyewitness identifications, for purposes of his motion to suppress and at trial. In testimony proffered by the defendant in connection with his motion to suppress, Dysart opined that, generally: (1) the perpetrator's use of a disguise, including a hat, can

---

[1] I agree with the majority opinion in all other respects.

impair a witness' ability to make an accurate identification—the "disguise effect"; (2) a witness is more likely to identify a person as the perpetrator if the witness believes that the perpetrator looks familiar—a phenomenon known as "unconscious transference"; (3) when the perpetrator carries a weapon, a witness tends to focus on the weapon rather than on the perpetrator, thereby reducing the likelihood of an accurate identification—the "weapons focus effect"; (4) a witness' confidence in his or her identification bears little or no relation to the accuracy of that identification; (5) a witness under stress when observing the commission of a crime is less likely to identify the perpetrator accurately; and (6) witness collaboration can adversely affect the accuracy of an eyewitness identification.[2] The state objected to Dysart's proffered testimony, claiming, inter alia, that it was inadmissible in light of this court's determination in *State* v. *Kemp*, supra, 199 Conn. 477, and *State* v. *McClendon*, 248 Conn. 572, 586, 730 A.2d 1107 (1999), that such testimony generally is within the common knowledge and experience of the average person and, therefore, would not aid the fact finder in evaluating the identification evidence.

The trial court agreed to allow Dysart to testify at the suppression hearing on several issues relating to the manner in which the police had administered the photographic identification procedure in the present case.[3] The court also permitted Dysart to testify about the theory of unconscious transference. In express reliance on *Kemp* and *McClendon*, however, the court sustained the state's objection with respect to any tes-

---

[2] Dysart also testified about certain problems with the manner in which the police had conducted the photographic identification procedures pursuant to which Crimley and Caple had made their out-of-court identifications of the defendant.

[3] In particular, the court permitted Dysart to testify about the simultaneous presentation of photographs, police instructions to the witnesses and the double-blind administration of the identification procedure.

timony by Dysart concerning her opinion that the relia-
bility of an identification can be adversely affected by
witness stress, witness collaboration, the perpetrator's
use of a disguise or a weapon, and that the witness'
confidence in the accuracy of the identification bears
little or no relation to the accuracy of the identification.
The court explained that, as this court had determined
in *Kemp* and *McClendon,* the excluded testimony was
unnecessary because it fell "within the realm . . . of
common sense and . . . experience."[4] After consider-
ing that portion of Dysart's testimony that it previously
had found to be admissible, the trial court denied the
defendant's motion to suppress the evidence establish-
ing that Crimley and Caple initially had identified the
defendant as the perpetrator.

I turn next to the principles that govern the resolution
of the defendant's claim, beginning with the applicable
standard of review. "[T]he trial court has wide discre-
tion in ruling on the admissibility of expert testimony
and, unless that discretion has been abused or the ruling
involves a clear misconception of the law, the trial
court's decision will not be disturbed. . . . In
determining whether there has been an abuse of discre-
tion, the ultimate issue is whether the court could rea-
sonably conclude as it did. . . .

---

[4] As the majority has explained, the trial court stated that it wanted "to
make it clear for the record, whatever [the court is] ruling [on] here with
respect to topics or admissibility is . . . only with respect to the motion
. . . to suppress, where the court is both the finder of fact and the . . .
ruler on the legal issues." The trial court further stated that, "[o]bviously,
there may be . . . some arguments that need not be repeated, if and when
that testimony is offered at trial. But [the court] just want[s] the record to
be clear that, at this point, [it is] only ruling on admissibility, as to the
hearing before [it]." I agree with the majority that this statement by the
court was sufficient to alert the defense that, if it wished to adduce testimony
by Dysart at trial, it was required to raise the issue at the time of trial. The
defense failed to do so, however. Consequently, I also agree with the majority
that the defendant is not entitled to review of his claim, first, because it is
unpreserved and, second, because the defense may have opted against
having Dysart testify at trial for tactical reasons.

"This court recently articulated the test for the admission of expert testimony, which is deeply rooted in common law. Expert testimony should be admitted when: (1) the witness has a special skill or knowledge directly applicable to a matter in issue, (2) that skill or knowledge is not common to the average person, and (3) the testimony would be helpful to the court or jury in considering the issues. . . . In other words, [i]n order to render an expert opinion the witness must be qualified to do so and there must be a factual basis for the opinion. . . .

"It is well settled that [t]he true test of the admissibility of [expert] testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter; but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the court or the jury in determining the questions at issue. . . . Implicit in this standard is the requirement . . . that the expert's knowledge or experience must be directly applicable to the matter specifically in issue." (Citations omitted; internal quotation marks omitted.) *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 157–59, 971 A.2d 676 (2009); see also Conn. Evid. Code § 7-2.[5]

"Beyond these general requirements regarding the admissibility of expert testimony, [t]here is a further hurdle to the admissibility of expert testimony when that testimony is based on . . . scientific [evidence].

---

[5] Section 7-2 of the Connecticut Code of Evidence provides: "A witness qualified as an expert by knowledge, skill, experience, training, education or otherwise may testify in the form of an opinion or otherwise concerning scientific, technical or other specialized knowledge, if the testimony will assist the trier of fact in understanding the evidence or in determining a fact in issue."

In those situations, the scientific evidence that forms the basis for the expert's opinion must undergo a validity assessment to ensure reliability. *State* v. *Porter*, [241 Conn. 57, 68–69, 698 A.2d 739 (1997), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998)]. In *Porter*, this court followed . . . *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and held that scientific evidence should be subjected to a flexible test, with differing factors that are applied on a case-by-case basis, to determine the reliability of the scientific evidence. . . . Following *State* v. *Porter*, supra, 81–84, scientific evidence, and expert testimony based thereon, usually is to be evaluated under a threshold admissibility standard assessing the reliability of the methodology underlying the evidence and whether the evidence at issue is, in fact, derived from and based [on] that methodology . . . which has been referred to as the fit requirement." (Citations omitted; internal quotation marks omitted.) *Maher* v. *Quest Diagnostics, Inc.*, 269 Conn. 154, 168, 847 A.2d 978 (2004).

With respect to the admissibility of expert testimony on the reliability of eyewitness identifications, this court first addressed the issue nearly twenty-five years ago in *State* v. *Kemp*, supra, 199 Conn. 473. In *Kemp*, the defendants, Harold Kemp and Robert Kemp, who had been charged in connection with the armed robbery of an army and navy surplus store; see id., 474; sought to introduce the expert trial testimony of Robert Buckhout, "a psychologist and recognized authority on the factors [that] affect the accuracy of identifications." Id., 475. The Kemps offered Buckhout's testimony for the purpose of impeaching the reliability of several witnesses who had identified them as the robbers. In particular, Buckhout was prepared to explain to the jury that: "(1) stress, particularly stress during an incident involving violence by a weapon, may decrease the relia-

bility of the identification; (2) memory is not a recording device [that] accurately records an event and does not change over time; (3) the identification process is affected by post-event information learned by a witness; (4) and the level of certainty demonstrated by a person does not reflect a corresponding level of accuracy." (Internal quotation marks omitted.) Id. After an evidentiary hearing outside the jury's presence, the trial court denied the Kemps' request to present Buckhout's testimony. Id.

Following their convictions, the Kemps appealed to this court, claiming, inter alia, that the trial court improperly had precluded Buckhout's testimony. Id. We concluded that the trial court, like courts in other jurisdictions, properly had done so; see id., 476; because "the reliability of eyewitness identification is within the knowledge of jurors and expert testimony generally would not assist them in determining the question." Id., 477. We further explained that "[s]uch testimony is also disfavored because . . . it invades the province of the jury to determine what weight or effect it wishes to give to eyewitness testimony." (Internal quotation marks omitted.) Id. Although we acknowledged that, "in many cases the determination of guilt or innocence depends in large part on the credibility assigned to eyewitness identifications, and that in many instances identifications may be unreliable"; id., 478; we also observed that "[t]his does not mean that a criminal defendant is without protection." Id. We explained, in particular, that due process permits the use of such identifications only if they meet a minimum reliability threshold and, further, that "[t]he weaknesses of identifications can be explored on cross-examination and during counsel's final arguments to the jury." Id. We stated that, because the "reliability of the identifications [could] be adequately questioned by such means and the jury [was] capable of understanding the reasons

why they may be unreliable, the introduction of expert testimony would [have been] a superfluous attempt to put the gloss of expertise, like a bit of frosting, [on] inferences [that] lay persons were equally capable of drawing from the evidence." (Internal quotation marks omitted.) Id., 478–79. We also observed that the trial court, in its jury instructions, had "emphasized the critical nature of the [eyewitness] identifications [at issue] and reviewed various factors [that] might affect their reliability, including delay, performance under stress and inaccuracy of prior descriptions." Id., 479 n.3. Noting that defense counsel had been afforded "ample opportunity to question the witnesses who identified [the Kemps] and [thereby] expose any weaknesses of the identifications"; id., 479; we concluded that "[t]he trial court properly [had] excluded the proffered expert testimony on the basis that it would not have aided the jury in its deliberations." Id.

Approximately thirteen years after our decision in *Kemp*, this court, in *State* v. *McClendon*, supra, 248 Conn. 572, had occasion to revisit the issue that we had addressed in *Kemp*. In *McClendon*, a jury found the defendant, Charles McClendon, guilty of felony murder and robbery stemming from the fatal shooting of two men during the robbery of a moving company. Id., 574–75. McClendon's conviction was predicated in large measure on the out-of-court and in-court identifications of McClendon as the perpetrator by an employee of the moving company. See id., 577. On appeal to the Appellate Court, McClendon claimed that the trial court improperly had precluded him from presenting the testimony of Michael Leippe, a psychologist with expertise in the subject of eyewitness identification and memory retention. *State* v. *McClendon*, 45 Conn. App. 658, 666–67, 697 A.2d 1143 (1997). The Appellate Court rejected McClendon's claim, concluding, in reliance on *Kemp*, that the trial court reasonably had determined that the

proffered expert testimony "was within the general knowledge of the jurors and that it would not aid them to resolve the issues at hand." Id., 667.

Upon our granting of McClendon's petition for certification to appeal, we agreed with the Appellate Court that the trial court properly had excluded Leippe's testimony. *State* v. *McClendon*, supra, 248 Conn. 585. In doing so, we explained that Leippe would have testified, "among other things, that the confidence of an eyewitness does not correlate to the accuracy of observation, that variables such as lighting, stress and time to observe have an impact on accuracy, that leading questions and the repetition of testimony can increase an eyewitness' confidence but not accuracy, that people remember faces best when they analyze many features and characteristics of the face rather than just one, that misleading police questions can alter memories, and that the most accurate descriptions are given immediately after a crime." Id., 586–87. We concluded that "Leippe's [proffered] testimony support[ed] the trial court's decision that his conclusions were nothing outside the common experience of mankind." (Internal quotation marks omitted.) Id., 586. We also explained, as we had in *Kemp*, that any weaknesses in eyewitness identifications may be probed on cross-examination and highlighted during argument to the jury, both of which had been done at length by McClendon's counsel. Id., 588. We further noted that the trial court had "instructed the jury to consider the potential unreliability of eyewitnesses, with specific reference to the conditions under which the witnesses viewed the perpetrator, the distance between them, and the length of time between the incident and the witnesses' description." Id., 587.

Finally, we declined McClendon's invitation to follow the rationale pertaining to the admissibility of expert testimony on eyewitness identifications that the Ari-

zona Supreme Court previously had adopted in *State v. Chapple*, 135 Ariz. 281, 660 P.2d 1208 (1983). In *Chapple*, the court concluded that, under the facts of that case, the trial judge had abused his discretion in precluding the defendant, Dolan Chapple, from adducing expert testimony that eyewitnesses generally experience a rapid "forgetting curve" following the initial identification, "that stress causes inaccuracy of perception with subsequent distortion of recall," that eyewitnesses are affected by "unconscious transfer," that they "frequently incorporate into their identifications inaccurate information gained subsequent to the event and confused with the event," and that there is "no relationship between the confidence [with] which a witness has in his or her identification and the actual accuracy of that identification." (Internal quotation marks omitted.) Id., 293–94. In reaching its determination, the Arizona Supreme Court, after observing that "the law has long recognized the inherent danger in eyewitness [identification] testimony"; id., 293; explained that it could not "assume that the average juror would be aware of the variables concerning identification and memory about which [the expert] was qualified to testify." Id., 294. The court stated further that "[d]epriving [the] jurors of the benefit of scientific research on eyewitness [identification] testimony force[d] them to search for the truth without full knowledge and opportunity to evaluate the strength of the evidence. In short, this deprivation prevent[ed] [the] jurors from having the best possible degree of understanding the subject toward which the law of evidence strives." (Internal quotation marks omitted.) Id. In *McClendon*, however, we rejected the analysis in *Chapple* in favor of the analysis that we previously had employed in *Kemp*.[6] *State v. McClendon*, supra, 248 Conn. 589.

[6] We also rejected the contention that the case was controlled by our decision in *State v. Barletta*, 238 Conn. 313, 321, 680 A.2d 1284 (1996), in which we had concluded that it was an abuse of discretion for the trial court to preclude testimony from an expert concerning the effects of cocaine

Research reveals that the courts of this state routinely have relied on the rationale that we employed in *Kemp* and *McClendon* in rejecting the claim that a defendant was entitled to present expert testimony concerning the reliability of eyewitness identifications. See, e.g., *State* v. *Monteeth*, 208 Conn. 202, 210 n.5, 544 A.2d 1199 (1988); *State* v. *Boscarino*, 204 Conn. 714, 733–34, 529 A.2d 1260 (1987); *State* v. *Elliott*, 8 Conn. App. 566, 571–72, 513 A.2d 1285, cert. denied, 201 Conn. 813, 517 A.2d 630 (1986); *Velasco* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. TSR-CV05-4000321-S (August 13, 2008), aff'd, 119 Conn. App. 164, 987 A.2d 1031, cert. denied, 297 Conn. 901, 994 A.2d 1284 (2010); *Kennedy* v. *Commissioner of Correction*, Superior Court, judicial district of Tolland, Docket No. TSR-CV06-4000972-S (April 29, 2008); cf. *State* v. *Manson*, 118 Conn. App. 538, 550–51, 984 A.2d 1099 (2009) (concluding that trial court properly had precluded expert testimony on reliability of eyewitness identifications because that testimony was not relevant to case but noting that trial court also had found that negative effect of stress on memory and absence of relationship between witness' degree of certainty in identification and accuracy of that identification were factors not generally within knowledge of jurors), cert. denied, 295 Conn. 902, 988 A.2d 878 (2010); *State* v. *Kelly*, Superior Court, judicial district of Ansonia-Milford, Docket No. CR07-61742 (January 16, 2009) (relying on *Kemp* in excluding certain testimony of expert witness on accuracy of eyewitness identifications but permitting other testimony of expert on ground that it would aid jury). It is true, of course, that neither *Kemp* nor its progeny purports to erect a per se bar to the

use on the cognitive abilities of an eyewitness to a crime. *State* v. *McClendon*, supra, 248 Conn. 589. We dismissed the contention on the basis that the expert testimony in *Barletta* was a "far cry from Leippe's proposed testimony" in *McClendon*. Id. Thus, we concluded that our decision in *Barletta* had no effect on the continued validity of *Kemp*. Id.

admission of expert testimony on the reliability of eyewitness identifications. Understandably, however, courts consistently have barred the use of such expert testimony in reliance on the reasoning employed in *Kemp* because, according to *Kemp*, the substance of that testimony is known to the average juror, the testimony would encroach unduly on the jury's responsibility to determine what weight to give the eyewitness testimony, and other means, including cross-examination and closing argument of counsel, are sufficient to apprise jurors of any potential weakness in the particular eyewitness identification at issue. See *State* v. *Kemp*, supra, 199 Conn. 477–78. Thus, although our cases upholding the exclusion of such expert testimony have done so, as in *Kemp*, on the ground that the exclusion did not constitute an abuse of discretion, in each and every one of those cases, our reasons for approving the exclusion reflect the view that such evidence is not of a kind that meets the test for admissibility as expert testimony. Indeed, as one habeas court recently observed in rejecting a petitioner's claim that his trial counsel had rendered ineffective assistance for failing to present expert testimony on the reliability of eyewitness identifications, "[e]ven [as of 2008], there [was] no appellate case law in Connecticut authorizing the admission of such testimony." *Velasco* v. *Commissioner of Correction*, supra; accord *Kennedy* v. *Commissioner of Correction*, supra; see also *Velasco* v. *Commissioner of Correction*, supra (observing in footnote that issue of admissibility of expert testimony on reliability of eyewitness identifications was before this court in present case). For the reasons that follow, however, it is clear that our treatment of the issue in *Kemp* and *McClendon*, even if defensible at one time, no longer represents the proper analysis.[7]

---

[7] I note that the Appellate Court recently has observed that "the assertion in *State* v. *Kemp*, supra, 199 Conn. 477, that 'the reliability of eyewitness identification is within the knowledge of jurors and expert testimony generally would not assist them in determining the question' may have been true

It is true, of course, that courts long have recognized the inherent danger in eyewitness testimony.[8] Indeed, more than forty years ago, the United States Supreme Court observed that "[t]he vagaries of eyewitness identification are well-known; the annals of criminal law are rife with instances of mistaken identification. [United States Supreme Court] Justice [Felix] Frankfurter once said: 'What is the worth of identification testimony even when uncontradicted? The identification of strangers is proverbially untrustworthy. The hazards of such testimony are established by a formidable number of instances in the records of English and American trials. These instances are recent—not due to the brutalities of ancient criminal procedure.' " *United States* v. *Wade*, 388 U.S. 218, 228, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967); see also *State* v. *Ledbetter*, 275 Conn. 534, 577, 881 A.2d 290 (2005) ("courts are not blind to the inherent risks of relying on eyewitness identification"), cert. denied, 547 U.S. 1082, 126 S. Ct. 1798, 164 L. Ed. 2d 537 (2006); *State* v. *Tatum*, 219 Conn. 721, 733, 595 A.2d 322 (1991) ("[t]he dangers of misidentification are well known and have been widely recognized throughout the United States"). Moreover, United States Supreme Court Justice William J. Brennan, Jr., observed nearly three decades ago: "[D]espite its inherent unreliability, much eyewitness identification evidence has a powerful

in 1986, when *Kemp* was decided, but it seems dubious today in light of significant research developments in the area. . . . [C]ourts seem to be having difficulty keeping up with, and adapting to, the changing landscape in this area. See *State* v. *Marquez*, 291 Conn. 122, 168–85, 967 A.2d 56 (2009) (*Katz, J.*, concurring); id., 185–214 (*Palmer, J.*, concurring)." *Velasco* v. *Commissioner of Correction*, supra, 119 Conn. App. 173 n.4. Of course, in contrast to this court, the Appellate Court lacked authority to overrule *Kemp* despite its dubious underpinnings.

[8] These dangers are generally limited to eyewitness identifications of strangers or persons with whom the eyewitness is not very familiar. Although there may be exceptions, for obvious reasons, the identification of a person who is well known to the eyewitness does not give rise to the same risk of misidentification as the identification of a person who is not well known to the eyewitness.

impact on juries. Juries seem most receptive to, and not inclined to discredit, testimony of a witness who states that he saw the defendant commit the crime.

" '[E]yewitness testimony is likely to be believed by jurors, especially when it is offered with a high level of confidence, even though the accuracy of an eyewitness and the confidence of that witness may not be related to one another at all. All the evidence points rather strikingly to the conclusion that there is almost nothing more convincing than a live human being who takes the stand, points a finger at the defendant, and says "That's the one!" ' " *Watkins* v. *Sowders*, 449 U.S. 341, 352, 101 S. Ct. 654, 66 L. Ed. 2d 549 (1981) (Brennan, J., dissenting); see also *Kampshoff* v. *Smith*, 698 F.2d 581, 585 (2d Cir. 1983) ("There can be no reasonable doubt that inaccurate eyewitness testimony may be one of the most prejudicial features of a criminal trial. Juries, naturally desirous to punish a vicious crime, may well be unschooled in the effects that the subtle compound of suggestion, anxiety, and forgetfulness in the face of the need to recall often has on witnesses. Accordingly, doubts over the strength of the evidence of a defendant's guilt may be resolved on the basis of the eyewitness' seeming certainty when he points to the defendant and exclaims with conviction that veils all doubt, '[T]hat's the man!' "). It is not surprising, therefore, that "[i]n recent years, extensive studies have supported a conclusion that eyewitness misidentification is the single greatest source of wrongful convictions in the United States." *State* v. *Wright*, 147 Idaho 150, 157, 206 P.3d 856 (App. 2009). Despite this longstanding recognition of the inherent unreliability of eyewitness identifications, courts frequently have rebuffed defense efforts to introduce expert testimony on the subject.

"Over the last decade, there have been extensive studies on the issue of identification evidence, research that

is now impossible . . . to ignore." *State* v. *Dubose*, 285 Wis. 2d 143, 162, 699 N.W.2d 582 (2005). These studies, which "detail the extensive amount of behavioral science research in this area"; *State* v. *Copeland*, 226 S.W.3d 287, 299 (Tenn. 2007); are found in "literally hundreds of articles in scholarly, legal, and scientific journals on the subject of eyewitness testimony." Id. In fact, according to a recent law review article, there have been more than 2000 studies concerning eyewitness identification; R. Schmechel et al., "Beyond the Ken? Testing Jurors' Understanding of Eyewitness Reliability Evidence," 46 Jurimetrics 177, 180 (2006); see also *State* v. *Dubose*, supra, 162 ("there have been extensive studies on the issue of identification evidence"); a number that one court has characterized as "far exceeding the research on most mental health evidence . . . ." *State* v. *Wright*, supra, 147 Idaho 157; see also *United States* v. *Smith*, 621 F. Sup. 2d 1207, 1212–13 (M.D. Ala. 2009) ("[n]umerous studies have been done under controlled conditions assessing the factors that influence eyewitnesses in accordance with generally accepted practice in the behavioral science community done independent[ly] of any litigation" [internal quotation marks omitted]). Furthermore, "researchers are nearly unanimous on the reliability of these studies' findings regarding factors that contribute to eyewitness misidentification."[9] *State* v. *Wright*,

---

[9] See, e.g., *Ferensic* v. *Birkett*, 501 F.3d 469, 482 (6th Cir. 2007) ("expert testimony on eyewitness identifications . . . is now universally recognized as scientifically valid and of aid [to] the trier of fact for admissibility purposes" [internal quotation marks omitted]); *United States* v. *Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986) ("This court accepts the modern conclusion that the admission of expert testimony regarding eyewitness identifications is proper . . . . We cannot say [that] such scientific data [are] inadequate or contradictory. The scientific validity of the studies confirming the many weaknesses of eyewitness identification cannot be seriously questioned at this point." [Internal quotation marks omitted.]); *United States* v. *Downing*, 753 F.2d 1224, 1242 and n.23 (3d Cir. 1985) (noting "the proliferation of empirical research demonstrating the pitfalls of eyewitness identification" and "the [impressive] consistency of the results of these studies," and agreeing that "the science of eyewitness perception has achieved the level of

supra, 157. Thus, "[t]he scientific evidence [concerning the fallibility of eyewitness identifications] . . . is voluminous, comprehensive and consistent. It is . . . reported in . . . hundreds of peer-reviewed studies and meta-analyses . . . . The soundness and reliability of that evidence are indisputable. . . .

"The science abundantly demonstrates the many vagaries of memory encoding, storage and retrieval; the malleability of memory; the contaminating effects of extrinsic information; the influence of police interview techniques and identification procedures; and the many other factors that bear on the reliability of eyewitness identifications. . . . The wide recognition of the science by social scientists, forensic experts, law enforce-

exactness, methodology and reliability of any psychological research" [internal quotation marks omitted]); *United States* v. *Feliciano*, United States District Court, Docket No. CR-08-0932-01 (D. Ariz. November 5, 2009) ("[t]he degree of acceptance [of the scientific data on the reliability of eyewitness identifications] within the scientific community . . . is substantial"); *People* v. *McDonald*, 37 Cal. 3d 351, 364–65, 690 P.2d 709, 208 Cal. Rptr. 236 (1984) ("[E]mpirical studies of the psychological factors affecting eyewitness identification have proliferated, and reports of their results have appeared at an ever-accelerating pace in the professional literature of the behavioral and social sciences. . . . The consistency of the results of these studies is impressive, and the courts can no longer remain oblivious to their implications for the administration of justice." [Citations omitted.]), overruled in part on other grounds by *People* v. *Mendoza*, 23 Cal. 4th 896, 4 P.3d 265, 98 Cal. Rptr. 2d 431 (2000); *Brodes* v. *State*, 279 Ga. 435, 440–41, 614 S.E.2d 766 (2005) (scientific validity of research studies concerning unreliability of eyewitness identifications is well established); *People* v. *Legrand*, 8 N.Y.3d 449, 455, 867 N.E.2d 374, 835 N.Y.S.2d 523 (2007) ("[E]xpert psychological testimony on eyewitness identification [is] sufficiently reliable to be admitted, and the vast majority of academic commentators have urged its acceptance. . . . [P]sychological research data [are] by now abundant, and the findings based [on the data] concerning cognitive factors that may affect identification are quite uniform and well documented . . . ." [Internal quotation marks omitted.]); *State* v. *Copeland*, supra, 226 S.W.3d 299 ("[s]cientifically tested studies, subject to peer review, have identified legitimate areas of concern" in area of eyewitness identification); *State* v. *Clopten*, 223 P.3d 1103, 1108 (Utah 2009) ("empirical research has convincingly established that expert testimony is necessary in many cases to explain the possibility of mistaken eyewitness identification").

ment agencies, law reform groups, legislatures and courts powerfully confirms its soundness. . . . The scientific findings, in short, are reliable, definitive and unquestionably fit for use in the courtroom." (Citations omitted.) G. Gaulkin, Report of the Special Master, *State* v. *Henderson*, New Jersey Supreme Court, Docket No. A-8-08 (June 10, 2010) pp. 72–73, available at http://www.judiciary.state.nj.us/pressrel/HENDERSON %20FINAL%20BRIEF%20.PDF%20(00621142).PDF (last visited August 18, 2010); see *State* v. *Henderson*, Docket No. A-8-08, 2009 N.J. LEXIS 45, *3 (N.J. February 26, 2009) (court remanded case to trial court for development of record to determine whether existing test for assessing reliability of eyewitness identification evidence is still valid in light of recent scientific evidence and studies). In fact, this court recently has endorsed the use of these studies by our trial courts in connection with the determination of whether a particular eyewitness identification procedure was conducted in an unnecessarily suggestive manner. See *State* v. *Ledbetter*, supra, 275 Conn. 575; see also *State* v. *Marquez*, 291 Conn. 122, 155 and n.31, 967 A.2d 56, cert. denied, 558 U.S. 895, 130 S. Ct. 237, 175 L. Ed. 2d 163 (2009).

These studies establish, first, "that eyewitness memory is much more malleable and susceptible to error than is generally realized"; R. Wise, K. Dauphinais & M. Safer, "A Tripartite Solution to Eyewitness Error," 97 J. Crim. L. & Criminology 807, 812 (2007); second, that many different factors can adversely affect the reliability of eyewitness identifications and, third, that the average person either is not aware of these factors or does not appreciate the extent to which they may play a role in undermining the accuracy of identifications. For example, it is widely accepted that (1) there exists at best only a weak correlation between a witness' confidence in his or her identification and the

accuracy of the identification,[10] (2) when a weapon is involved, the reliability of the identification is diminished by the witness' focus on the weapon,[11] (3) a high level of stress at the time of the witness' observations may render the witness less able to retain an accurate perception and memory of the events,[12] (4) cross-racial identifications are considerably less accurate than same-race identifications,[13] (5) the fact that a perpetra-

---

[10] See, e.g., *United States* v. *Williams*, 522 F.3d 809, 811 (7th Cir. 2008); *United States* v. *Brownlee*, 454 F.3d 131, 143–44 (3d Cir. 2006); *United States* v. *Stevens*, 935 F.2d 1380, 1400 (3d Cir. 1991); *United States* v. *Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986); *People* v. *McDonald*, 37 Cal. 3d 351, 369, 690 P.2d 709, 208 Cal. Rptr. 236 (1984), overruled in part on other grounds by *People* v. *Mendoza*, 23 Cal. 4th 896, 4 P.3d 265, 98 Cal. Rptr. 2d 431 (2000); *Johnson* v. *State*, 272 Ga. 254, 256 n.2, 526 S.E.2d 549 (2000); *People* v. *Young*, 7 N.Y.3d 40, 43, 45, 850 N.E.2d 623, 817 N.Y.S.2d 576 (2006); see also *State* v. *Ledbetter*, supra, 275 Conn. 576 ("the correlation between witness confidence and accuracy tends to be weak, and witness confidence can be manipulated").

[11] See, e.g., *United States* v. *Brownlee*, 454 F.3d 131, 136–37 (3d Cir. 2006); *United States* v. *Smith*, 736 F.2d 1103, 1106 (6th Cir.), cert. denied, 469 U.S. 868, 105 S. Ct. 213, 83 L. Ed. 2d 143 (1984); *United States* v. *Lester*, 254 F. Sup. 2d 602, 612–13 (E.D. Va. 2003); *People* v. *Cornwell*, 37 Cal. 4th 50, 78, 80, 117 P.3d 622, 33 Cal. Rptr. 3d 1 (2005), overruled in part on other grounds by *People* v. *Doolin*, 45 Cal. 4th 390, 198 P.3d 11, 87 Cal. Rptr. 3d 209 (2009); *Benn* v. *United States*, 978 A.2d 1257, 1271 (D.C. 2009); *Commonwealth* v. *Christie*, 98 S.W.3d 485, 490 (Ky. 2002).

[12] See, e.g., *United States* v. *Downing*, 753 F.2d 1224, 1231–32 (3d Cir. 1985); *United States* v. *Smith*, supra, 621 F. Sup. 2d 1216; *State* v. *Chapple*, supra, 135 Ariz. 294; *Brodes* v. *State*, 279 Ga. 435, 438, 614 S.E.2d 766 (2005); *People* v. *Young*, 7 N.Y.3d 40, 43, 850 N.E.2d 623, 817 N.Y.S.2d 576 (2006); *State* v. *Bradley*, 181 Ohio App. 3d 40, 44, 907 N.E.2d 1205, review denied, 122 Ohio St. 3d 1480, 910 N.E.2d 478 (2009).

[13] See, e.g., *United States* v. *Rodriguez-Felix*, 450 F.3d 1117, 1124 n.8 (10th Cir.), cert. denied, 549 U.S. 968, 127 S. Ct. 420, 166 L. Ed. 2d 297 (2006); *United States* v. *Harris*, 995 F.2d 532, 535 (4th Cir. 1993); *United States* v. *Smith*, supra, 621 F. Sup. 2d 1215; *United States* v. *Graves*, 465 F. Sup. 2d 450, 456 (E.D. Pa. 2006); *United States* v. *Lester*, 254 F. Sup. 2d 602, 613 (E.D. Va. 2005); *People* v. *McDonald*, 37 Cal. 3d 351, 368, 690 P.2d 709, 208 Cal. Rptr. 236 (1984), overruled in part on other grounds by *People* v. *Mendoza*, 23 Cal. 4th 896, 4 P.3d 265, 98 Cal. Rptr. 2d 431 (2000); *People* v. *Abney*, 13 N.Y.3d 251, 259–60, 918 N.E.2d 486, 889 N.Y.S.2d 890 (2009); *State* v. *Copeland*, supra, 226 S.W.3d 302.

It is noteworthy that cross-racial identifications have been characterized as "particularly suspect." *United States* v. *Jernigan*, 492 F.3d 1050, 1054 (9th Cir. 2007); see also G. Gaulkin, supra, p. 48 ("Several meta-analyses

tor was wearing a hat or hood may negatively impact
the witness' ability to identify the perpetrator,[14] (6) the
identification of the perpetrator by the witness may be
less reliable unless a double-blind, sequential identifica-
tion procedure is used,[15] (7) a witness may develop
unwarranted confidence in his or her identification if
he or she is privy to postevent or postidentification
information relating to the event or to the identifica-
tion,[16] and (8) the accuracy of an eyewitness identifica-

published over the past [twenty] years consistently show that other-race
recognition is poorer than same-race recognition. . . . One of these studies,
reviewing [thirty-nine] research articles involving 5000 witness/participants,
found that a mistaken identification was 1.56 times more likely in other-
race conditions, and participants were 2.2 times as likely to accurately
identify own-race faces as [opposed to] other-race faces."). In light of this
fact, it is especially troubling that this court previously has "rejected the
notion of special treatment for defendants in cross-racial identification situa-
tions"; *State* v. *Porter*, supra, 241 Conn. 134–35 n.80; explaining, in particular,
that "the mere fact that a defendant is of a different race than a witness
does not entitle the defendant to a special instruction on eyewitness identifi-
cation at trial." Id., citing *State* v. *Cerilli*, 222 Conn. 556, 571–72, 610 A.2d
1130 (1992). To the extent that these statements indicate that the problems
inherent in cross-racial identifications are not a proper subject for expert
testimony, this court should disavow any such suggestion in light of the
myriad of scientific studies and case law recognizing that cross-racial identifi-
cations are significantly less reliable than same-race identifications. The
majority's refusal to address the issue is most unfortunate in light of the
opportunity to do so in the present case.

[14] See, e.g., *United States* v. *Feliciano*, United States District Court, Docket
No. CR-08-0932-01 (D. Ariz. November 5, 2009); *Sturgeon* v. *Quarterman*,
615 F. Sup. 2d 546, 568 (S.D. Tex. 2009).

[15] See, e.g., *Davis* v. *Cline*, United States District Court, Docket No. 06-
3127-KHV (D. Kan. May 24, 2007) (double-blind and sequential identification
procedures); *United States* v. *Graves*, 465 F. Sup. 2d 450, 455 (E.D. Pa.
2006) (sequential identification procedure); *Brown* v. *State*, Alaska Court
of Appeals, Docket Nos. A-8586 and A-9108 (August 2, 2006) (double-blind
and sequential identification procedures); *State* v. *Pearce*, 146 Idaho 241,
246–47, 259, 192 P.3d 1065 (2008) (double-blind identification procedure);
*Commonwealth* v. *Silva-Santiago*, 453 Mass. 782, 791, 906 N.E.2d 299 (2009)
(double-blind and sequential identification procedures); *People* v. *Williams*,
14 Misc. 3d 571, 582–83, 830 N.Y.S.2d 452 (2006) (double-blind and sequential
identification procedures); *Stephenson* v. *State*, 226 S.W.3d 622, 626 (Tex.
App. 2007) (sequential identification procedure); *State* v. *Shomberg*, 288
Wis. 2d 1, 13, 709 N.W.2d 370 (2006) (sequential identification procedure).

[16] See, e.g., *United States* v. *Brownlee*, 454 F.3d 131, 137 (3d Cir. 2006);
*United States* v. *Smith*, supra, 621 F. Sup. 2d 1216–17; *Brown* v. *State*,

tion may be adversely affected by unconscious trans-
ference, which occurs when a person seen in one situa-
tion or context is confused with or recalled as a person
seen in another situation or context.[17] It bears emphasis
that these examples are illustrative rather than
exhaustive.

Presently, courts often permit expert testimony on
any factor that may be shown to reduce or undermine
the accuracy of eyewitness identifications if that factor
bears on the particular identification at issue. Courts
allow such expert testimony to be admitted because it
has been established, contrary to our conclusion in
*Kemp* and *McClendon,* that most of those factors are
not within the common knowledge and experience of
jurors. In fact, a great many of them are counterintu-
itive. See, e.g., *United States* v. *Brownlee,* 454 F.3d 131,
142 (3d Cir. 2006) ("while science has firmly established
the inherent unreliability of human perception and
memory . . . this reality is outside the jury's common
knowledge, and often contradicts jurors' commonsense
understandings" [citations omitted; internal quotation
marks omitted]); *United States* v. *Smithers,* 212 F.3d
306, 312 n.1 (6th Cir. 2000) ("because many of the fac-
tors affecting eyewitness impressions are counter-intu-
itive, many jurors' assumptions about how memories
are created are actively wrong"); *United States* v.
*Smithers,* supra, 316 ("There is no question that many
aspects of perception and memory are not within the
common experience of most jurors, and . . . many fac-
tors that affect memory are counter-intuitive"); H. Fra-
della, "Why Judges Should Admit Expert Testimony on

Alaska Court of Appeals, Docket Nos. A-8586 and A-9108 (August 2, 2006);
*State* v. *Chapple,* supra, 135 Ariz. 294; *Benn* v. *United States,* 978 A.2d 1257,
1271 n.50 (D.C. 2009).

[17] See, e.g., *United States* v. *Harris,* 995 F.2d 532, 535 (4th Cir. 1993);
*United States* v. *Smith,* 736 F.2d 1103, 1106 (6th Cir.), cert. denied, 469 U.S.
868, 105 S. Ct. 213, 83 L. Ed. 2d 143 (1984); *State* v. *Chapple,* supra, 135
Ariz. 294.

the Unreliability of Eyewitness Testimony," 2 Fed Cts. L. Rev. 1, 24 (2007) ("[t]he scientific research on memory, generally, and eyewitness identification in particular are quite counterintuitive and hardly commonsensical" [internal quotation marks omitted]); G. Gaulkin, supra, p. 48 ("[s]tudies examining whether and to what extent jurors [or potential jurors] know or correctly intuit the findings reported in the eyewitness identification literature report that laypersons are largely unfamiliar with those findings and often hold beliefs to the contrary"); see also G. Gaulkin, supra, p. 49 (studies demonstrate that laypersons "underestimate the importance of proven indicators of [eyewitness] accuracy," "tend to rely heavily on factors that the research finds are not good indicators of accuracy," and "tend to overestimate witness accuracy rates").

For example, most people believe that the more confidence that an eyewitness demonstrates in his identification, the more likely it is that the identification is accurate. Similarly, the average person is likely to think that an eyewitness who had been held at gunpoint or otherwise placed in fear is likely to have been acutely observant of the unfolding events and, as a consequence, more accurate in his identification. In fact, neither of these beliefs is true. See, e.g., *United States* v. *Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986) ("Expert testimony on eyewitness reliability is not simply a recitation of facts available through common knowledge. Indeed, the conclusions of the psychological studies are largely *counter-intuitive*, and serve to explode common myths about an individual's capacity for perception . . . . For example, it is commonly believed that the accuracy of a witness' recollection increases with the certainty of the witness. In fact, the data reveal no correlation between witness certainty and accuracy. Similarly, it is commonly believed that witnesses remember better when they are under stress. The data

indicate that the opposite is true. The studies also show that a group consensus among witnesses as to an alleged criminal's identity is far more likely to be inaccurate than is an individual identification. This is because of the effect of the feedback factor, which serves to reinforce mistaken identifications." [Citation omitted; emphasis in original; internal quotation marks omitted.]); *People* v. *McDonald*, 37 Cal. 3d 351, 362, 690 P.2d 709, 208 Cal. Rptr. 236 (1984) ("empirical research has undermined a number of widespread lay beliefs about the psychology of eyewitness identification, e.g., that the accuracy of a [witness'] recollection increases with his certainty, that accuracy is also improved by stress, that cross-racial factors are not significant, and that the reliability of an identification is unaffected by the presence of a weapon or violence at the scene"), overruled in part on other grounds by *People* v. *Mendoza*, 23 Cal. 4th 896, 4 P.3d 265, 98 Cal. Rptr. 2d 431 (2000); *Johnson* v. *State*, 272 Ga. 254, 256 n.2, 526 S.E.2d 549 (2000) (importance of expert testimony on reliability of eyewitness identifications especially great when it "involves issues which are 'counter-intuitive' or 'contrary to common wisdom' . . . such as the absence of an expected correlation between the witness' expression of confidence in the identification and actual accuracy, or the impairment effect acute stress or the presence of a weapon may have on accuracy"); *People* v. *Abney*, 13 N.Y.3d 251, 268, 918 N.E.2d 486, 889 N.Y.S.2d 890 (2009) (counterintuitive that accuracy of eyewitness identification may be adversely affected by, inter alia, event stress, weapon focus, cross-racial identification and witness confidence). Indeed, it has been demonstrated that one of these counterintuitive factors, namely, the weak correlation between confidence and accuracy, "is the most powerful single determinant of whether or not observers of that testimony will believe that the eyewitness made an accurate identification

. . . ." (Citations omitted.) G. Wells et al., "Eyewitness Identification Procedures: Recommendations for Lineups and Photospreads," 22 Law & Hum. Behav. 603, 620 (1998). Thus, "[a]lthough research has convincingly demonstrated the weaknesses inherent in eyewitness identification, jurors are, for the most part, unaware of these problems. People simply do not accurately understand the deleterious effects that certain variables can have on the accuracy of the memory processes of an honest eyewitness. . . . Moreover, the common knowledge that people do possess often runs contrary to documented research findings."[18] (Citations omitted; internal quotation marks omitted.) *State* v. *Copeland*, supra, 226 S.W.3d 300; accord *State* v. *Butterfield*, 27 P.3d 1133, 1146 (Utah 2001).

Consequently, there is a growing consensus among both federal and state courts that the methods traditionally employed for challenging the accuracy of eyewitness identifications are largely ineffective and inadequate. First, the method most commonly relied on, cross-examination, is not a satisfactory substitute for expert testimony, in part, because most eyewitnesses who express confidence in the accuracy of their identification sincerely believe that that confidence is warranted. "[B]ecause eyewitnesses may express almost absolute certainty about identifications that are inaccu-

---

[18] Furthermore, to the extent that jurors may have some general knowledge or familiarity with one or more of the deficiencies of eyewitness identifications, "experts may testify even when jurors are not wholly ignorant about the subject of the testimony. . . . [I]f . . . [total ignorance] were the test, little expert opinion testimony would ever be heard. . . .

"Rather, the pertinent question is whether, even if jurors have some knowledge of the subject matter, expert opinion testimony would assist the jury." (Citations omitted; internal quotation marks omitted.) *People* v. *Prince*, 40 Cal. 4th 1179, 1222, 156 P.3d 1015, 57 Cal. Rptr. 3d 543 (2007), cert. denied, 552 U.S. 1106, 128 S. Ct. 887, 169 L. Ed. 2d 742 (2008); see also *State* v. *Clopten*, 223 P.3d 1103, 1109 (Utah 2009) (expert testimony on reliability of eyewitness identifications performs beneficial function even when it assists jurors by quantifying that which they already may know).

rate, research shows the effectiveness of cross-examination is badly hampered. Cross-examination will often expose a lie or half-truth, but may be far less effective when witnesses, although mistaken, believe that what they say is true. In addition . . . eyewitnesses are likely to use their expectations, personal experience, biases, and prejudices to fill in the gaps created by imperfect memory. . . . Because it is unlikely that witnesses will be aware that this process has occurred, they may express far more confidence in the identification than is warranted." (Citation omitted; internal quotation marks omitted.) *State* v. *Clopten*, 223 P.3d 1103, 1110 (Utah 2009). Moreover, "[e]ven if cross-examination reveals flaws in the identification, expert testimony may still be needed to assist the jury. Cross-examination might show, for example, that the perpetrator was a different race than the eyewitness and was also wearing a disguise. Without the assistance of expert testimony, a jury may have difficulty assessing the import of those factors in gauging the reliability of the identification." Id.; see also *Ferensic* v. *Birkett*, 501 F.3d 469, 481–82 (6th Cir. 2007) (cross-examination of eyewitness not effective substitute for expert testimony on reliability of eyewitness identifications); *Benn* v. *United States*, 978 A.2d 1257, 1279 (D.C. 2009) (cross-examination generally not adequate substitute for expert testimony because "the information that an expert can provide about research studies is different in nature and cannot be elicited from a lay witness during cross-examination"); *State* v. *Copeland*, supra, 226 S.W.3d 300 (research indicates that cross-examination is insufficient to educate jurors on problems with eyewitness identifications).

Similarly, jury instructions generally are inadequate to apprise the jury of the potential weaknesses of eyewitness testimony. See, e.g., *Ferensic* v. *Birkett*, supra, 501 F.3d 481–82; *State* v. *Copeland*, supra, 226 S.W.3d

300. "Trial courts . . . have often tried to remedy the possibility of mistaken identification by giving cautionary instructions to the jury. . . . [I]t seemed logical that this measure would substantially enhance a jury's ability to evaluate eyewitness accuracy." (Citations omitted.) *State* v. *Clopten*, supra, 223 P.3d 1100. "Subsequent research, however, has shown that a cautionary instruction does little to help a jury spot a mistaken identification. While this result seems counterintuitive, commentators and social scientists advance a number of convincing explanations. First, instructions given at the end of what might be a long and fatiguing trial, and buried in an overall charge by the court, are unlikely to have much effect on the minds of [the jurors]. . . . Second, instructions may come too late to alter [a juror's] opinion of a witness whose testimony might have been heard days before. Third, [and perhaps most importantly] even the best cautionary instructions tend to touch only generally on the empirical evidence. The judge may explain that certain factors are known to influence perception and memory, but will not explain how this occurs or to what extent." (Citation omitted; internal quotation marks omitted.) Id., 1110–11; see also H. Fradella, supra, 2 Fed. Cts. L. Rev. 25 ("Jury instructions do not explain the complexities about perception and memory in a way a properly qualified person can. Expert testimony . . . can do that far better than being told the results of scientific research in a conclusory manner by a judge . . . especially since jury instructions are given far too late in a trial to help jurors evaluate relevant eyewitness testimony with information beyond their common knowledge." [Internal quotation marks omitted.]); R. Wise, K. Dauphinais & M. Safer, supra, 97 J. Crim. L. & Criminology 833 ("[J]ury instructions lack the flexibility and specificity of expert testimony. . . . [J]udges' instructions do not serve as an effective safeguard against mistaken identifications

and convictions and . . . expert testimony is therefore more effective than judges' instructions as a safeguard." [Internal quotation marks omitted.]). Consequently, jury instructions, standing alone, are not a sufficient protection against mistaken identifications.

Defense counsel's closing argument to the jury also does not suffice to render expert testimony unnecessary. Unsupported by expert testimony, argument by counsel on the deficiencies of eyewitness identifications is likely to be viewed by the jury as little more than partisan advocacy lacking a firm basis in science or fact. See, e.g., *Ferensic* v. *Birkett*, supra, 501 F.3d 482 ("The significance of [the proffered expert] testimony cannot be overstated. Without it, the jury ha[s] no basis beyond defense counsel's word to suspect the inherent unreliability of the [eyewitnesses'] identifications."). Moreover, it stands to reason that the effectiveness of argument to the jury will be greatly diminished when the subject of that argument is a factor that has been found to affect adversely the accuracy of an identification but that is counterintuitive; without expert testimony, such argument may well appeal to the jury as particularly weak or suspect. Thus, expert testimony on the pitfalls of eyewitness identifications, no less than any other expert testimony that is likely to assist the jury in its understanding of a key fact or issue in a case, should not be barred merely because defense counsel has the right, during closing argument, to explain why, in the defendant's view, the identification was not trustworthy.

In addition, there is no reason to prohibit an expert from testifying on the problems of eyewitness identifications on the ground that such testimony infringes on the responsibility of the jury to evaluate witness credibility, that it will confuse the jurors or that jurors are likely to place too much emphasis on the expert's opinion. Any such expert would not be permitted to

opine about the credibility or accuracy of the eyewitness testimony itself; that determination is solely within the province of the jury. Rather, the expert testimony presumably would cover those factors that have been found to have an adverse effect on the reliability of eyewitness identifications generally and that are relevant to the particular eyewitness identification at issue. Although the expert testimony is designed to assist the jury in ascertaining the extent to which the jury should credit the eyewitness testimony, there is no material difference between it and expert testimony on battered woman syndrome; see, e.g., *State* v. *Borrelli*, 227 Conn. 153, 174, 629 A.2d 1105 (1993) ("[The] expert testimony was properly admitted to assist the jury in understanding, not whether [the victim] was a credible witness on the witness stand, but whether her conduct . . . was consistent with the pattern and profile of a battered woman. . . . [Such] expert testimony [does] not invade the province of the jury in determining the credibility of witnesses." [Citation omitted; internal quotation marks omitted.]); or on the manner in which victims of child sexual abuse often react to that abuse.[19] See, e.g., *State* v. *Iban C.*, 275 Conn. 624, 635, 881 A.2d 1005 (2005) ("[I]n cases that involve allegations of sexual abuse of children . . . expert testimony of reactions and behaviors common to victims of sexual abuse is

---

[19] Thus, expert testimony on the reliability of eyewitness identifications "does not seek to take over the jury's task of judging credibility: [such testimony] does not tell the jury that any particular witness is or is not truthful or accurate in his identification of the defendant. Rather, it informs the jury of certain factors that may affect such an identification in a typical case; and to the extent that it may refer to the particular circumstances of the identification before the jury, such testimony is limited to explaining the potential effects of those circumstances on the powers of observation and recollection of a typical eyewitness. The jurors retain both the power and the duty to judge the credibility and weight of all testimony in the case, as they are told [in] a standard instruction." *People* v. *McDonald*, supra, 37 Cal. 3d 370–71; see also *Benn* v. *United States*, supra, 978 A.2d 1274 (expert testimony on reliability of eyewitness identifications does not usurp function of jury).

admissible. . . . Such evidence assists a jury in its determination of the victim's credibility by explaining the typical consequences of the trauma of sexual abuse on a child. . . . It is not permissible, however, for an expert to testify as to his opinion of whether a victim in a particular case is credible or whether a particular victim's claims are truthful." [Citations omitted; internal quotation marks omitted.]). Finally, "[a]s is true of all expert testimony, the jury remains free to reject it entirely after considering the expert's opinion, reasons, qualifications, and credibility." *People* v. *McDonald,* supra, 37 Cal. 3d 371. There simply is no reason to think, therefore, that the jury will treat such testimony differently from any other expert testimony that meets the standard for admissibility under our rules of evidence.[20]

It is true, of course, that permitting expert testimony on the reliability of eyewitness identifications in any given case may result in a somewhat longer trial. This fact alone, however, is not a basis for excluding such testimony, which generally will be highly relevant, and

---

[20] As one commentator on eyewitness identifications recently has observed in discussing two of the reasons that courts most frequently have given for precluding such expert testimony, namely, that the testimony addresses an issue that falls within the common knowledge of jurors and that it intrudes unduly on the province of the jury to assess witness credibility: "Courts that accept this reasoning appear to give jurors both too much credit, and not enough. Such reasoning ignores scientific research showing that jurors have limited knowledge of eyewitness factors and that the effect of many factors on eyewitness accuracy is not a matter of common sense. It also reflects concern that wily experts will induce naive and susceptible jurors to reject eyewitness testimony that is reliable. Furthermore, it ignores jurors' tendenc[ies] to be skeptical of experts, especially defense experts, whose testimony goes against what they consider simple common sense." R. Wise, C. Fishman & M. Safer, "How to Analyze the Accuracy of Eyewitness Testimony in a Criminal Case," 42 Conn. L. Rev. 435, 453–54 (2009). For these reasons, the argument, accepted by several courts, that expert testimony on the reliability of eyewitness identifications "intrudes too much on the traditional province of the jury to assess witness credibility"; *United States* v. *Lumpkin,* 192 F.3d 280, 289 (2d Cir. 1999); simply is not persuasive.

perhaps crucial, to the defense. See, e.g., *United States* v. *Brownlee*, supra, 454 F.3d 144 ("[i]t would seem anomalous to hold that the probative value of expert opinion offered to show the unreliability of eyewitness testimony so wastes time or confuses the issue that it cannot be considered even when the putative effect is to vitiate the [primary] evidence offered by the government" [internal quotation marks omitted]); *State* v. *Chapple*, supra, 135 Ariz. 295 ("the problem of time is not present in [a] case [involving expert testimony on the reliability of eyewitness identifications] . . . since time spent on the crucial issue of the case cannot be considered as 'undue' loss of time"); *People* v. *McDonald*, supra, 37 Cal. 3d 372 ("[e]vidence that is relevant to the prime theory of the defense cannot be excluded in wholesale fashion merely because the trial would be simpler without it"). Moreover, the trial court "retains discretion to place reasonable limitations on the expert's testimony to avoid overwhelming the jury or unduly burdening the court, [as] long as these limitations are consistent with the requirements of the defense." *Benn* v. *United States*, supra, 978 A.2d 1262; see also id., 1275 (any reasonable "concern [that] a trial judge may have that admission of expert testimony [on the reliability of eyewitness identifications] could confuse or overwhelm the jury is more appropriately dealt with, not by exclusion, but by placing reasonable limitations on the expert's testimony and instructing the jurors that they—and only they—are the ultimate fact finders"). In fact, a contrary conclusion might well infringe on the defendant's constitutional right to present a defense, depending on the facts of the case. See, e.g., *Washington* v. *Schriver*, 255 F.3d 45, 56–57 (2d Cir. 2001) (constitutional right to present meaningful defense may be implicated by improper exclusion of expert testimony).

Thus, as the District of Columbia Court of Appeals recently observed, "[a]lthough the admission of expert

testimony falls within the discretion of the trial [court] . . . because the right to confront witnesses and to present a defense are constitutionally protected, [i]n exercising its discretion, the trial court must be guided by the principles that the defense should be free to introduce appropriate expert testimony. Not only is the defendant entitled to present a defense, but that defense should not be put at a disadvantage in the use of scientific evidence comparable to that permitted to the government. Fairness dictates a balanced judicial approach in permitting use in criminal trials of expert testimony concerning subtle psychological factors that might affect witnesses. The defense should be permitted to present expert testimony on the unreliability of eyewitness testimony in appropriate cases, just as the government is allowed in appropriate cases to introduce expert evidence to explain the failure of government witnesses to promptly identify or accuse an attacker in order to build a case for the prosecution." (Internal quotation marks omitted.) *Benn* v. *United States*, supra, 978 A.2d 1269–70; see also H. Fradella, supra, 2 Fed. Cts. L. Rev. 25 ("[I]t should be recognized that expert testimony on the unreliability of certain eyewitness identifications adds to the length and expense of trial. However, a defendant's right to a fair trial should trump those concerns, as no conviction should be based [on] common misconceptions regarding the alleged reliability of what someone saw with their own eyes. Taking the time to educate a jury on the biases and errors involved in eyewitness identification is worth the time, especially since expert testimony about eyewitness identification improves juror functioning.").

The pressing need to reconsider the analytical underpinnings of our decisions in *Kemp* and *McClendon* is bolstered by recent evidence confirming what long has been suspected, that is, that there exists a direct correlation between eyewitness testimony and wrongful con-

victions. "In addition to the experimental literature, cases of proven wrongful convictions of innocent people have consistently shown that mistaken eyewitness identification is responsible for more of these wrongful convictions than all other causes combined . . . ." (Citations omitted.) G. Wells et al., supra, 22 Law & Hum. Behav. 605. In fact, studies of DNA exonerations have demonstrated that mistaken eyewitness identifications were involved in between 64 and 86 percent of all wrongful convictions. See, e.g., J. McMurtrie, "The Role of the Social Sciences in Preventing Wrongful Convictions," 42 Am. Crim. L. Rev. 1271, 1275 n.17 (2005) (citing to studies revealing that erroneous identifications have accounted for up to 86 percent of convictions of persons ultimately exonerated by DNA testing); S. Gross et al., "Exonerations in the United States: 1989 Through 2003," 95 J. Crim. L. & Criminology 523, 542 (2005) (citing study demonstrating that 64 percent of wrongful convictions involved at least one erroneous eyewitness identification). These findings, and the other extensive research that has occurred over the last thirty years, have "shown that expert testimony on memory and eyewitness identification is the only legal safeguard that is effective in sensitizing jurors to eyewitness errors."[21] J. McMurtrie, supra, 1276; see also R. Wise,

---

[21] I note that some appellate courts have concluded that it is not an abuse of discretion for a trial court to exclude otherwise admissible expert testimony on the reliability of eyewitness identifications if the eyewitness' testimony is corroborated by other evidence of the defendant's guilt. See, e.g., United States v. Moore, supra, 786 F.2d 1312–13; State v. Wright, supra, 147 Idaho 158; People v. Young, 7 N.Y.3d 40, 45–46, 850 N.E.2d 623, 817 N.Y.S.2d 576 (2006). This view apparently is predicated on the belief that, in such circumstances, the trial court reasonably could have concluded that the eyewitness testimony was "quite unlikely to be mistaken, and that [the expert's] testimony would be an unnecessary distraction for the jury." People v. Young, supra, 46. As a general matter, however, I see no reason why a defendant should be precluded from presenting otherwise admissible expert testimony on the reliability of eyewitness identifications merely because the state's case is not predicated solely on eyewitness testimony. In my view, a contrary conclusion would put the defendant at an unfair disadvantage with respect to his ability to challenge the identification evidence specifically and

K. Dauphinais & M. Safer, supra, 97 J. Crim. L. & Criminology 819 ("expert eyewitness testimony . . . is the only traditional legal safeguard that has shown any efficacy in mitigating eyewitness error"); cf. B. Garrett, "Judging Innocence," 108 Colum. L. Rev. 55, 81 (2008) ("most exonerees had no successful basis for challenging what we now know to be incorrect eyewitness identifications").

Even though eyewitness testimony is "often hopelessly unreliable"; (internal quotation marks omitted) *State* v. *Dubose,* supra, 285 Wis. 2d 162; accord *Commonwealth* v. *Vardinski,* 438 Mass. 444, 450, 780 N.E.2d 1278 (2003); jurors frequently rely on that testimony as powerful evidence of guilt. See, e.g., *Watkins* v. *Sowders,* supra, 449 U.S. 352 (Brennan, J., dissenting). In large measure, this is so because jurors are unaware of many of the factors that adversely affect the accuracy of eyewitness identifications, including, of course, those factors that are counterintuitive. See *United States* v. *Smithers,* supra, 212 F.3d 312 n.1; see also

---

the state's case generally. Of course, the trial court retains broad discretion concerning the admissibility of expert testimony, including expert testimony on the reliability of eyewitness identifications, and there may be cases in which the court reasonably determines that, under the circumstances presented, the testimony of an expert on eyewitness identifications simply is unnecessary. For example, some factors affecting the reliability of eyewitness identifications may be so well-known that cross-examination and appropriate jury instructions will suffice to protect against any genuine risk of misidentification. See, e.g., *United States* v. *Rodriguez-Berrios,* 573 F.3d 55, 71–72 (1st Cir. 2009), cert. denied, 559 U.S. 905, 130 S. Ct. 1300, 175 L. Ed. 2d 1076 (2010). I also can conceive of the exceptional case in which the state's evidence linking the defendant to the crime, wholly apart from any eyewitness identification testimony, is so overwhelming that there is no reasonable possibility that the defendant could demonstrate any harm or prejudice arising out of his inability to adduce expert testimony on the reliability of eyewitness identifications. Generally speaking, however, the defendant should be entitled to present such expert testimony, and the trial court remains free to take appropriate measures to ensure both that the testimony is properly tailored to the facts of the case and that it is not unduly burdensome, confusing or distracting.

*United States* v. *Downing*, 753 F.2d 1224, 1230–32 (3d Cir. 1985). Moreover, as recent studies have confirmed, "[t]his ignorance can lead to devastating results." *United States* v. *Smithers*, supra, 312 n.1. It is abundantly clear, therefore, that the ability of a defendant to mount an effective challenge to the accuracy of eyewitness testimony is a matter of paramount importance and essential to the fair administration of justice. In light of the results of the research on eyewitness identifications, it now is apparent that, generally, expert testimony is an appropriate method for challenging the shortcomings of those identifications. "[T]he law will always lag behind the sciences to some degree because of the need for solid scientific consensus before the law incorporates its teachings. . . . Appellate courts have a responsibility to look forward, and a legal concept's longevity should not be extended when it is established that it is no longer appropriate." (Citation omitted; internal quotation marks omitted.) *Brodes* v. *State*, 279 Ga. 435, 442, 614 S.E.2d 766 (2005). Contrary to our analysis and conclusion in *Kemp* and *McClendon*, therefore, there is absolutely no reason why courts should bar a qualified expert from testifying about the factors that tend to weaken or undermine the reliability of eyewitness identifications when the factors about which the expert is prepared to testify are relevant to the particular identification involved. Insofar as *Kemp* and *McClendon* are inconsistent with this conclusion, I would overrule them.

In the present case, the trial court concluded that Dysart qualified as an expert on the reliability of eyewitness identifications and, further, that her testimony was admissible with respect to several of the factors that she had determined were relevant to the eyewitness identifications at issue. The court, however, declined to consider Dysart's proffered testimony on several additional factors that also tend to detract from the

reliability of eyewitness identifications, specifically, the perpetrator's use of a disguise, stress, the perpetrator's use of a weapon, the lack of a correlation between . confidence and accuracy, and witness collaboration.[22] The court rejected that testimony on the ground that it was commonly known and, therefore, would not have aided the court in evaluating the eyewitness testimony. Because I would conclude, contrary to this court's determination in *Kemp* and *McClendon*, that such testimony is not inadmissible for that reason, I also would conclude that the trial court should not have rejected it on that ground.

The majority elects not to consider the merits of the defendant's claim because "[i]t is not this court's practice to overrule cases when it would have no effect on the case at hand." This assertion is incorrect. Although we sometimes decline to consider whether prior precedent should be overruled when doing so will not affect the result of the case on appeal, we have not hesitated to reconsider and to overrule or modify prior precedent, even if doing so is not outcome determinative, when, as in the present case, there is reason to do so. See, e.g., *State* v. *DeJesus*, 288 Conn. 418, 470–76, 953 A.2d 45 (2008) (modifying prior precedent concerning admissibility of prior misconduct evidence in recognizing propensity exception in sexual assault cases but concluding that trial court's impropriety in admitting that evidence for purpose of demonstrating common plan and scheme was harmless); *State* v. *Griffin*, 253 Conn. 195, 209–10, 749 A.2d 1192 (2000) (disapproving future use of two inference jury instruction, despite this court's previous approval of instruction, but rejecting defendant's claim of entitlement to new trial on basis of trial court's use of instruction); *State* v. *Malave*, 250

[22] I acknowledge that Dysart's testimony might have had little or no bearing on the reliability of Caple's identification of the defendant because Caple had known the defendant for more than three years at the time of the murder.

Conn. 722, 738, 743, 737 A.2d 442 (1999) (abandoning missing witness rule in criminal cases but concluding that application of rule in that case constituted harmless error); *State* v. *Schiappa*, 248 Conn. 132, 168, 175–77, 728 A.2d 466 (prohibiting future use of charge that requirement of proof beyond reasonable doubt is "a rule of law . . . made to protect the innocent and not the guilty," despite this court's prior approval of charge, but concluding that instruction was harmless), cert. denied, 528 U.S. 862, 120 S. Ct. 152, 145 L. Ed. 2d 129 (1999); *State* v. *Troupe*, 237 Conn. 284, 303–306, 677 A.2d 917 (1996) (modifying prior precedent concerning constancy of accusation rule without applying new rule to case on appeal); *State* v. *Patterson*, 230 Conn. 385, 390, 645 A.2d 535 (1994) (concluding that trial judge must be present for voir dire proceedings in all future criminal cases even though defendant in that case had waived that right); *State* v. *DeFreitas*, 179 Conn. 431, 449, 426 A.2d 799 (1980) (overruling prior precedent barring defendant from introducing certain hearsay evidence but concluding that trial court's reliance on that prior precedent was harmless). Because we now know that *Kemp* was wrongly decided, that its holding has resulted in, and continues to result in, the improper exclusion of important evidence on the unreliability of eyewitness identifications, and that eyewitness misidentifications account for the bulk of wrongful convictions, it is entirely appropriate for us to take this opportunity to overrule *Kemp*; indeed, under the circumstances, it is our duty to do so. Apparently, however, the majority intends to address the issue only if a case arises in which the trial court's reliance on *Kemp* is outcome determinative. In light of the importance of the issue, and because there is no telling when such a case will arise, there simply is no justification for the majority to await that case. Indeed, because it is so clear that *Kemp* was wrongly decided, it is imperative

that we address the issue now, lest our trial courts continue to be misguided by *Kemp* for the foreseeable future.

The majority also defends its decision to dodge the issue of whether *Kemp* should be overruled on the ground that *Kemp* involved the admissibility of expert testimony on eyewitness identifications in the context of a jury trial, whereas the present case involves the admissibility of such testimony in the context of a suppression hearing in which the court is the fact finder, and on the ground that "the proper use of this expert testimony calls into question the soundness of the test set forth by the United States Supreme Court" in *Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), because, in *Biggers*, the court identified the "level of certainty demonstrated by the witness" at the identification procedure as one of the many factors that may be relevant to the determination of the reliability of the identification. Neither of these grounds is persuasive. With respect to the first ground, the trial court relied exclusively on *Kemp* and *McClendon* in rejecting Dysart's proffered testimony and, in fact, quoted extensively from both cases. Thus, the majority's wholly unsupported assertion to the contrary notwithstanding, the claim of the defendant in the present case does not implicate "issues" or "concerns" that are "different" from those that would be implicated if that same claim had been raised at trial. Indeed, the majority is unable to identify even one such different issue or concern. With respect to the second ground, there simply is no conflict between the court's analysis in *Biggers* and the right of a defendant to adduce expert testimony concerning the reliability of eyewitness identifications. Of course, trial courts are free to instruct the jury in accordance with the factors identified in *Biggers*, including the level of certainty exhibited by the identifying witness. Expert testimony concerning the limited

nature of the nexus between witness certainty and the accuracy of his or her identification would serve only to place that particular factor in its proper context.

For the reasons set forth by the majority, however, the trial court's failure to consider the proffered testimony was harmless. Nevertheless, this court has an obligation to reconsider and overrule *Kemp* because its holding is invalid and because its application results in evidentiary rulings that deprive defendants of a fair opportunity to demonstrate the weaknesses inherent in eyewitness identifications, evidence that results in more wrongful convictions than any other evidence.

Accordingly, I concur in the result that the majority reaches with respect to its affirmance of the defendant's murder conviction.